IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

DYNAMIC AVIATION GROUP )
INC., DA2, LLC, )
)
    Plaintiffs, )    Case No. 5:15-CV-00058
)
v. )
)
DYNAMIC INTERNATIONAL )
AIRWAYS, LLC )    By:    Michael F. Urbanski
)             United States District Judge
)
    Defendant. )

## MEMORANDUM OPINION

This matter is before the court on the renewed motion for preliminary injunction filed by

plaintiffs Dynamic Aviation Group, Inc. and DA2, LLC (collectively "DAG"). ECF No. 45. DAG

seeks an Order enforcing provisions of a Membership Interest Purchase Agreement dated October

9, 2014 and precluding the defendant Dynamic International Airways, LLC ("DIA") from infringing

certain "DYNAMIC AVIATION" trademarks. The matter has been fully briefed, and the court

held an evidentiary hearing on February 10–11, 2016. For the reasons stated below, the court finds

that: (1) DAG is likely to succeed on the merits of some portion of its breach of contract and

trademark infringement claims; (2) DAG is likely to suffer irreparable harm in the absence of a

preliminary injunction; (3) the balance of the equities supports a preliminary injunction; and (4) a

preliminary injunction is in the public interest. Accordingly, DAG's renewed motion for preliminary

injunction is **GRANTED in part** and **DENIED in part**, and DIA is **PRELIMINARILY**

**ENJOINED** from using the name "Dynamic Airways" and using the "DYNAMIC AIRWAYS"

and "DYNAMIC" marks as specified below and in the accompanying Order.

This is a trademark and breach of contract dispute between two aviation companies. Both DAG and DIA provide airline services in a variety of domestic and international markets. DAG has been in operation for nearly eighty years, and is currently managed by Michael Stoltzfus, Chief Executive Officer, and his father Karl Stoltzfus, Chairman of the Board. Am. Compl., ECF No. 26 at ¶ 9. Based in Bridgewater, Virginia, DAG offers a range of services to its customers, including airborne intelligence gathering, surveillance, data acquisition, fire management, insect sterilization, passenger charters, and medevac services. Id. at ¶¶ 4, 8. As of 2009, DAG had facilities in Virginia, California, Florida, and Panama. Id. at ¶ 15. DAG also operates passenger flights between New York and Boston through its partnership with Beacon, a third party aviation company. ECF No. 55, at 7; Pl. Ex. 35, ECF No. 56-35. It plans to expand those passenger operations in the near future. Zook Aff., ECF No. 46-1, at ¶ 3.

In contrast, DIA operates a commercial passenger and transport service based out of Greensboro, North Carolina. ECF No. 31, at ¶¶ 5, 27–28. DIA serves markets in the United States, Asia, and South America, including Orlando, Fort Lauderdale, Guyana, Palau, Hong Kong, and Brazil. Paul Kraus and Kenneth Woolley are alleged to be the current owners of DIA.

### A. The Relevant Trademarks

DAG claims use of the name "Dynamic" for at least twenty years, and holds two registered trademarks for the mark "DYNAMIC AVIATION." Federal Trademark Registration ("FTR") No. 3316437 was registered on October 23, 2007 and is a standard character mark for the phrase:

# Dynamic Aviation

Ex. A, ECF No. 26-1. Federal Trademark Registration No. 4532409 was registered on May 20, 2014 and is a mark with the phrase "Dynamic Aviation" placed next to a revolving globe as shown below:



Ex. B, ECF No. 26-2. Color is not claimed as a feature of FTR No. 4532409, though DAG often displays this mark with the phrase "Dynamic Aviation" in red font, and the revolving globe as either white or blue:





Donoian Aff., ECF No. 55-3, at 2; Pl. Ex. 34, ECF No. 56-34. DAG argues that these marks and the word "Dynamic" are now associated with its operations in the aviation industry. Am. Compl., ECF No. 26, at ¶¶ 11, 14. Moreover, DAG alleges it has spent several million dollars developing its "DYNAMIC AVIATION" brand, and claims to have acquired significant goodwill and public recognition for the quality of its services. Id.

For its part, DIA claims no registered trademarks. However, DIA uses the primary logo show below:



3

See, e.g., Pl. Ex. 46, ECF No. 58-7, at 5–7. This "DYNAMIC" mark is used on DIA's airplanes, its main website www.airdynamic.com, and its advertising and marketing materials. See id.; Pl. Ex. 29, ECF No. 56-29; Pl. Ex. 31, ECF No. 56-31.

In addition to its "DYNAMIC" mark, DIA designed two similar marks. The first uses the company's full name, "Dynamic International Airways:"



Donoian Aff., ECF No. 55-3, at 2; Pl. Ex. 26, ECF No. 56-26. However, there is little evidence that DIA uses its "DYNAMIC INTERNATIONAL AIRWAYS" mark in commerce.

DIA's second similar mark uses the phrase "Dynamic Airways," as shown below:



Pl. Ex. 47, ECF No. 58-8. As with DIA's "DYNAMIC INTERNATIONAL AIRWAYS" mark, there is little evidence DIA uses the "DYNAMIC AIRWAYS" mark on its planes or in its marketing materials. However, the "DYNAMIC AIRWAYS" mark appeared on a second website operated by DIA, www.fly-dynamic.com, as recently as February 11, 2016. Id. The www.fly-dynamic.com website links to DIA's main www.airdynamic.com website. Id.

### B. Sale of Dynamic Airways, LLC

The dispute between DAG and DIA arises out of the sale of Dynamic Airways, LLC in 2014. Dynamic Airways, LLC was formed in 2008 by Michael and Karl Stoltzfus as a passenger carrier service. Am. Compl., ECF No. 26, at ¶ 9. In 2010, Dynamic Airways, LLC acquired a "Part 121" certification from the Federal Aviation Administration ("FAA"), and began passenger flights

4

using a fleet of McDonnell Douglas ("MD") 80 series and Boeing 767 aircraft. Id. at ¶¶ 16–17. These flights served several locations in the Eastern United States, as well as Brazil and Guyana. Id. Although Dynamic Airways, LLC operated the flights under the FAA certificate issued to it, the service was marketed to consumers under the "EasyJet" name. Two years later, the Stoltzfuses took steps to sell Dynamic Airways, LLC and its associated Part 121 certificate to Kraus and Woolley. Id. at ¶ 17.

Between approximately January 2013 and October 2014, the Stoltzfuses negotiated the sale of Dynamic Airways, LLC to Kraus and Woolley. Id. at ¶¶ 18–22. As part of this negotiation, the parties discussed whether the company would keep the name Dynamic Airways, LLC after the sale. Id. DAG claims it told Kraus and Woolley they could not use the name "Dynamic" in any form after they acquired the company. Kraus disagrees.[1] He concedes that he was required to change the company name from Dynamic Airways, LLC, but argues he could use other "Dynamic" names, including "Dynamic International Airways" or "Air Dynamic."

The Stoltzfuses sold their interest in Dynamic Airways, LLC in two stages. The first transaction took place in July 2013 when the Stoltzfuses transferred 80% of their interest in Dynamic Airways, LLC to Kraus and Woolley. Id. at ¶ 18. In relevant part, the 2013 Purchase Agreement stated:

> **Name**: For a period of up to ninety days after the Closing (the "**Name Change Date**"), the name of the Company will remain Dynamic Airways LLC; provided, however, the Company shall conduct all business operations under a fictitious name effective immediately following the Closing Date. Buyers agree to change the name of the Company on or prior to the expiration of the Name Change Date.

Ex. C, ECF No. 55-8, at § 7.04. However, Kraus failed to change the name from Dynamic Airways, LLC as required by the July 2013 Purchase Agreement.

---

[1] While Kraus and Woolley were both involved in the purchase of Dynamic Airways, LLC, only Kraus has offered testimony in this case.

5

As a result, the parties began to dispute the name issue. Starting in January 2014, Kraus exchanged emails with Merle Zook, a senior executive at DAG, and other DAG executives. See, e.g., Pl. Ex. 6, ECF No. 56-6; Pl. Ex. 9, ECF No. 56-9; Pl. Ex. 10, ECF No. 56-10. In these emails, Kraus agreed that the 2013 Purchase Agreement required that he cease use of the name "Dynamic Airways, LLC." However, Kraus requested permission to use two related names—"Air Dynamic" or "Dynamic International Airways"—in order to avoid disruptions to DIA's passenger operations. Pl. Ex. 10, ECF No. 56-10. DAG agreed to cooperate with the name change proposal, subject to written confirmation. Pl. Ex. 11, ECF No. 56-11. DAG sent Kraus a draft trademark license agreement on July 21, 2014. Kraus Aff., ECF No. 55-1, at ¶ 20. The licensing agreement allowed DIA to use the names "Air Dynamic" or "Dynamic International Airways" for 180 days, subject to an optional extension. Pl. Ex. 17, ECF No. 56-17. The parties discussed the terms of the license agreement for several weeks, but could not reach a final agreement. Pl. Ex. 18, ECF No. 56-18. The trademark license agreement was never signed.

During the same time period, the parties were negotiating the second stage of the sale of Dynamic Airways, LLC. Between approximately June 2014 and October 2014, the parties exchanged drafts of a Membership Interest Purchase Agreement ("MIPA") that would transfer the Stoltzfuses' remaining 20% interest in Dynamic Airways, LLC to Kraus and Woolley. See, e.g., Pl. Ex. 12, ECF No. 56-12; Pl. Ex. 19, ECF No. 56-19; Pl. Ex. 21, ECF No. 56-21. DAG employed a third party broker, Michael Wayshner, to help with the final negotiation. Kraus communicated primarily with Wayshner until a final agreement was reached in October 2014.

Various drafts of the MIPA addressed name usage, alternating between language allowing Kraus to use the names "Dynamic International Airways" and "Air Dynamic" and language forbidding use of these same names absent a separate licensing agreement. Compare Def. Ex. O,

6

ECF No. 55-26, at ¶ 7 <u>with</u> Def. Ex. S, ECF No. 55-30, at ¶ 7; Def. Ex. T, ECF No. 55-31, at ¶ 7;

Pl. Ex. 40, ECF No. 56-40, at ¶ 7. The final MIPA was signed on October 9, 2014, and stated:

> **7. Company Post-Closing Covenants**:  On or before October 9, 2014, the Company shall discontinue the use of (i) the name "Dynamic Airways" and (ii) any logo or trademark substantially similar to that mark used by Dynamic Aviation, Inc., or previously used by the Company while owned by the Seller or the Seller's Members.

Pl. Ex. C, ECF No. 26-3, at ¶ 7. Once again, Kraus failed to change the company's legal name from

"Dynamic Airways." However, Kraus did file a certificate in Guilford County, North Carolina on

October 7, 2014, noting DIA's intent to operate under the assumed name "Dynamic International

Airways, LLC." Def. Ex. JJ, ECF No. 58-2.[2]

Several months later, on April 6, 2015, Kraus emailed Zook requesting access to the website

www.dynamicairways. com. Pl. Ex. 23, ECF No. 56-23. Zook refused, and insisted that Kraus

discontinue use of the name "Dynamic Airways." Pl. Ex. 24, ECF No. 56-24. The parties

exchanged emails from April 2015 to June 2015 about the issue. Pl. Ex. 25, ECF No. 56-25; Pl. Ex.

26, ECF No. 56-26; Pl. Ex. 28, ECF No. 56-28. DAG then sent a "cease and desist" letter on June

5, 2015, to Kraus and Woolley, demanding they stop use of the name "Dynamic Airways" and avoid

use of the word "Dynamic" in any form. Pl. Ex. 27, ECF No. 56-27.

On August 17, 2015, Kraus filed an amendment with the Virginia State Corporation

Commission changing the company's legal name from "Dynamic Airways, LLC" to "Dynamic

International Airways, LLC." ECF No. 31, at ¶ 27. Kraus later sought an order from the United

States Department of Transportation ("DOT") reissuing various flight certificates to reflect this

name change. Pl. Ex. 30, ECF No 56-30. However, Kraus refused to cease use of all "Dynamic"

---

[2] While the certificate was signed by Bill Gray, the Chief Operating Officer of DIA, the accompanying notarization form makes it clear that Kraus authorized the filing. Def. Ex. JJ, ECF No. 58-2, at 2.

names, and the newly re-named DIA continued to use various "Dynamic" marks on its planes and in marketing materials, including the "DYNAMIC" mark described above.

## C. The Current Suit

DAG filed its original complaint on August 28, 2015, alleging that DIA's use of the names "Dynamic Airways," "Dynamic International Airways," and "Dynamic" infringed on DAG's registered trademarks for "DYNAMIC AVIATION." ECF No. 1. DAG filed a motion for a preliminary injunction that same day, and the court held an evidentiary hearing on September 22, 2015. During the hearing, DAG offered evidence of poor service and financial mismanagement at DIA that threatened DAG's reputation in the aviation industry. For its part, DIA claimed that the MIPA signed in 2014 did not forbid use of the names "Dynamic International Airways," "Air Dynamic," or "Dynamic." Because of factual disputes raised during the hearing, the court denied DAG's motion for preliminary injunction and ordered a sixty day discovery period to explore the prior contractual negotiations between DAG and DIA. ECF No. 20. DAG filed an amended complaint on November 13, 2015, alleging six counts:

- Count 1: Trademark infringement in violation of 15 U.S.C. § 1114 (infringing marks "Dynamic Airways," "Dynamic International Airways," and "Dynamic").

- Count 2: False designation of origin in violation of 15 U.S.C. § 1125(a).

- Count 3: Dilution of DAG's "DYNAMIC" marks.

- Count 4: Common law trademark infringement and unfair competition.

- Count 5: Breach of paragraph 7 of the MIPA signed on October 9, 2014.

- Count 6: Injunctive relief forbidding future use of any "DYNAMIC" marks, including "DYNAMIC AVIATION," "DYNAMIC AIRWAYS," "DYNAMIC INTERNATIONAL AIRWAYS," "AIR DYNAMIC," and "DYNAMIC."

ECF No. 26, at 13–18. Notably, DAG's amended complaint added a claim for breach of contract that did not appear in its original complaint.

8

On January 20, 2015, DAG filed a renewed motion for a preliminary injunction, seeking to enjoin DIA's use of the "DYNAMIC" marks and the word "Dynamic" in any form. ECF No. 45. In support, DAG cited additional evidence of consumer confusion and safety concerns with DIA's passenger operations. This evidence included news reports showing that a DIA-branded airplane caught fire in Fort Lauderdale, Florida on October 29, 2015. The court held a second evidentiary hearing on February 10–11, 2016, and heard testimony from Michael Stoltzfus, Zook, Wayshner, and Kraus. The parties also submitted extrinsic evidence about the negotiations preceding the signing of the MIPA. The matter is now ripe for disposition.

## II.

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 345 (4th Cir. 2009), vacated on other grounds, 130 S. Ct. 2371 (2010), reinstated in relevant part, 607 F.3d 355 (4th Cir. 2010). It is a remedy that is "'granted only sparingly and in limited circumstances.'" MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991) (internal quotation marks omitted)). The Court in Winter explained that in each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); see also Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 500 (1941).

Therefore, under Winter, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

9

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20; see also Real Truth About Obama, 575 F.3d at 347 (noting that, post-Winter, a plaintiff must make a "clear showing" that he is likely to succeed on the merits and is likely to be irreparably harmed absent preliminary relief). A preliminary injunction cannot be issued unless all four of these elements are met. Winter, 555 U.S. at 20; see also League of Women Voters of N. Carolina v. N. Carolina, 769 F.3d 224, 236 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015).[3]

## III.

DAG brings multiple claims, including trademark infringement, false designation of origin, dilution of DAG's "DYNAMIC" marks, common law trademark infringement and unfair competition, and breach of contract. However, "[i]n general, where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief." W. Indus.-N., LLC v. Lessard, No. 1:12-CV-177, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) (citing McNeil–PPC v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C. 1995)). In its current motion, DAG focuses on two claims—breach of contract and trademark infringement—and argues

---

[3] Neither party addressed whether this court should apply the heightened injunctive standard required when a plaintiff seeks a mandatory, rather than prohibitory, preliminary injunction. See Pro-Concepts, LLC v. Resh, No. 2:12-CV-573, 2013 WL 5741542, at *4 (E.D. Va. Oct. 22, 2013) ("The demanding standard [for preliminary injunctions] becomes even more exacting when a plaintiff seeks a preliminary injunction *that mandates action*, as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial.") (emphasis in original); see also Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (noting that a prohibitory injunction preserves the status quo pending trial, while a mandatory injunction mandates action by "order[ing] a responsible party to take action") (internal citations omitted). To the extent that DAG's current motion can be construed as one for a mandatory preliminary injunction, it must show that the "law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." Garcia, 786 F.3d at 740 (emphasis in original). Ultimately, the court finds the distinction between these standards irrelevant in this case. First, there is precedent suggesting that a preliminary injunction requiring an alleged infringer to cease use of confusingly similar trademarks is best construed as a prohibitory injunction, rather than a mandatory injunction. See Pro-Concepts, 2013 WL 5741542, at *5; see also 5 McCarthy on Trademarks and Unfair Competition § 30:50 (4th ed.) ("In a trademark case, the status quo ante litem to be preserved by a preliminary injunction is the situation prior to the time the junior user began use of its contested mark: the last peaceable, noncontested status."). Second, under either standard, DAG has met its burden under all four Winter factors. Thus, the court's ruling would not change even if it applied the more exacting standard for a mandatory preliminary injunction.

10

that it is entitled to an injunction on both counts. Because DAG's claim for breach of contract is interrelated with its claim for trademark infringement, the court turns first to the contract claim.

## A. Likelihood of Success on Claim for Breach of Contract

A plaintiff seeking a preliminary injunction must show that it is likely to succeed on the merits. To state a claim for breach of contract in Virginia, DAG must prove: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004).[4] The first element is undisputed in this case, as both DAG and DIA agree they are bound by the terms of the MIPA. The only dispute is whether DIA's use of the names "Dynamic Airways," "Dynamic International Airways," "Air Dynamic," and "Dynamic" violates paragraph 7 of the MIPA.

The court turns first to the plain language of the contract. See Flippo v. CSC Associates III, L.L.C., 262 Va. 48, 64, 547 S.E.2d 216, 226 (2001) ("The polestar for the construction of a contract is the intention of the contracting parties *as expressed by them in the words they have used.*") (emphasis in original) (internal citation omitted). In relevant part, the MIPA states:

> **7. Company Post-Closing Covenants**: On or before October 9, 2014, the Company shall discontinue the use of (i) the name "Dynamic Airways" and (ii) any logo or trademark substantially similar to that mark used by Dynamic Aviation, Inc., or previously used by the Company while owned by the Seller or the Seller's Members.

Pl. Ex. C, ECF No. 26-3, at ¶ 7. DAG argues that this paragraph is unambiguous, and forbids DIA from using names such as "Dynamic Airways," "Dynamic International Airways," "Air Dynamic," or "Dynamic." DIA disagrees, claiming that the MIPA is ambiguous. Specifically, DIA believes that the phrase "substantially similar" as used in subparagraph 7(ii) can have multiple meanings, and must be interpreted with reference to the pre-contract communications between DAG and DIA.

---

[4] The MIPA provides that Virginia law governs construction of the contract. ECF No. 26-3, at ¶ 12.

11

DIA believes this extrinsic evidence shows that DAG approved DIA's use of the name "Dynamic International Airways" and "Air Dynamic."

## 1. Breach of Subparagraph 7(i)

As to subparagraph 7(i), the court agrees that the MIPA is clear and unambiguous—DIA was required to cease use of the name "Dynamic Airways" on or before October 9, 2014. Golding v. Floyd, 261 Va. 190, 192, 539 S.E.2d 735, 736 (2001) ("[W]hen the terms of a contract are clear and unambiguous, a court is required to construe the terms according to their plain meaning."). DAG offers undisputed evidence that DIA continues to use the name "Dynamic Airways." For example, DIA owns and operates the website www.fly-dynamic.com, which links to DIA's main website www.airdynamic.com. As recently as February 11, 2016, the www.fly-dynamic.com website displayed a logo with the name "Dynamic Airways." Pl. Ex. 47, ECF No. 58-8. Further, the metadata for DIA's main website www.airdynamic.com appears to contain remnants of the name "Dynamic Airways," since an internet search for www.airdynamic.com labels the website as "Dynamic Airways." ECF No. 4-1, at 38.[5] Moreover, DIA recently applied to the United States Department of Transportation to reissue various interstate and foreign charter certificates under the name "Dynamic International Airways, LLC." Def. Ex. II, ECF No. 58-1. As part of that application, DIA requested registration of the trade name "Dynamic Airways" so that DIA could use that name for an "interim period" while it transitioned to its new corporate name. Id. at 4. The DOT approved DIA's request on February 4, 2016 and authorized DIA's use of "Dynamic Airways" as a trade name. Pl. Ex. 30, ECF No 56-30, at 2.

DIA does not contest these facts. Indeed, Kraus admitted that the MIPA forbids use of "Dynamic Airways," and that DIA was still using that name. Therefore, the court finds that DAG has made a clear showing that DIA is in breach of subparagraph 7(i) of the MIPA.

---

[5] The court finds it difficult to effectively cite to ECF No. 4-1 because of the many different exhibits attached to that filing. The court therefore uses the page numbers provided by the CM/ECF system where necessary.

## 2. Breach of Subparagraph 7(ii)

The dispute over subparagraph 7(ii) is a closer question. DAG claims subparagraph 7(ii) is also unambiguous, and "unequivocally" bars the use of "Dynamic International Airways," "Air Dynamic," or "Dynamic" because these names are substantially similar to "Dynamic Airways" and "Dynamic Aviation." ECF No. 46, at 11–12. Because DAG finds the language unambiguous, it argues that no extrinsic evidence should be admitted. The court disagrees.

Whether a contract term is ambiguous is a question of law for the court. Commonwealth Group-Winchester Partners, L.P. v. Winchester Warehousing, Inc., 332 F. App'x 913, 919 (4th Cir. 2009) (citing Musselman v. Glass Works, L.L.C., 260 Va. 342, 346, 533 S.E.2d 919, 921 (2000)). "An ambiguity exists when language is of doubtful import, admits of being understood in more than one way, admits of two or more meanings, or refers to two or more things at the same time." Allen v. Green, 229 Va. 588, 592, 331 S.E.2d 472, 475 (1985). Moreover, any ambiguity must "appear on the face of the instrument." Frederick County Sanitation Auth. v. O-N Minerals (Chemstone) Co., No. 5:11-CV-006, 2012 WL 5308036, at *4 (W.D. Va. Oct. 26, 2012) (citing Salzi v. Va. Farm Bureau Mut. Ins. Co., 263 Va. 52, 55, 556 S.E.2d 758, 760 (2002)). "Parol evidence cannot be used to first create an ambiguity and then remove it." Cohan v. Thurston, 223 Va. 523, 525, 292 S.E.2d 45, 46 (1982). Nor is a document "ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement." Amos v. Coffey, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984) (internal quotation marks omitted). Yet, where a contract "can reasonably have more than one meaning given its context . . .[w]here two constructions are equally possible, or reasonable [persons] . . . may reach reasonable, but opposite, conclusions based on a contract's language" the contract is ambiguous. SunTrust Mortg., Inc. v. AIG United Guar. Corp., 784 F. Supp. 2d 585, 592 (E.D. Va. 2011) (internal citations and quotation marks omitted). If an ambiguity exists, a court may admit extrinsic evidence "not to contradict or vary contract terms, but

13

to establish the real contract between the parties." Tuomala v. Regent Univ., 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996).[6] Finally, "[t]he construction of an ambiguous contract is a matter submitted to the trier of fact, who must examine the extrinsic evidence to determine the intention of the parties." Id.

At the outset, the court notes that subparagraph 7(ii) is not a model of clarity. The section states that DIA must discontinue use of "any logo or trademark substantially similar to that mark used by Dynamic Aviation, Inc., or previously used by the Company while owned by the Seller or the Seller's Members." Pl. Ex. C, ECF No. 26-3, at ¶ 7. The MIPA defines "Company" as "Dynamic Airways, LLC," the "Seller" as "DA2, LLC," and the "Seller's Members" as "Michael A. Stoltzfus and Karl D. Stoltzfus." Id. at 1. Further, the phrase "that mark" in subparagraph 7(ii) appears to refer to the name "Dynamic Airways" as it appears in subparagraph 7(i).[7] After adding these definitions, the court is faced with the following language: "[DIA] shall discontinue the use of . . . any logo or trademark substantially similar to [Dynamic Airways] used by Dynamic Aviation, Inc., or previously used by [Dynamic Airways, LLC] while owned by [DA2, LLC] or [Michael A. Stoltzfus and Karl D. Stoltzfus].

The key phrases are "substantially similar," "used by" and "previously used by"—the first clause of subparagraph 7(ii) appears to target any logo or trademark substantially similar to "Dynamic Airways" used by DAG, while the second clause addresses any logo or trademark previously used by Dynamic Airways, LLC during the time it was owned by Michael and Karl

---

[6] A number of Virginia courts make a distinction between patent and latent ambiguities when applying the parol evidence rule and allow extrinsic evidence only when the ambiguous contract term is a latent ambiguity. See, e.g., Lott v. Scottsdale Ins. Co., 827 F. Supp. 2d 626, 631–32 (E.D. Va. 2011) (collecting cases); SunTrust Mortg.,784 F. Supp. 2d at 592–94 (same). Patent ambiguities are those "where it is apparent on the face of the [contract] that the language can be interpreted in more than one way." Lott, 827 F. Supp. 2d at 631–32. Latent ambiguities are those where "the language in question appears perfectly clear at the time of contract formation, but owing to subsequently discovered or developed facts, may reasonably be interpreted in either of two ways." Id. (internal citation omitted). The court considers the ambiguity in this contract to be latent, allowing the consideration of extrinsic evidence. Cf. Galloway Corp. v. S.B. Ballard Const. Co., 250 Va. 493, 503, 464 S.E.2d 349, 355 (1995) (affirming admission of extrinsic evidence where the ambiguity was exposed only after subsequent events "brought the issue into focus").

[7] The MIPA describes "Dynamic Airways" as a "name" in subparagraph 7(i) and as a "mark" in subparagraph 7(ii). What significance, if any, the court should draw from this discrepancy is unclear.

14

Stoltzfus. However, the MIPA does not define the phrase "substantially similar," and does not list the logos and trademarks used by DAG or the logos and trademarks previously used by Dynamic Airways, LLC.

DAG and DIA focus on the definition of "substantially similar." DAG claims this phrase is unambiguous because it can be given a plain and ordinary meaning. DIA disagrees, and argues that "substantially similar" is ambiguous because reasonable people can disagree as to its meaning in this contract.[8] But neither party focuses on the ambiguities in the rest of subparagraph 7(ii)—namely, the language stating that a mark must be "used by" DAG or "previously used by" Dynamic Airways, LLC. It is not clear to the court, at least from the face the contract, how it should harmonize the requirement that a mark be "substantially similar" with the requirement that a mark also be "used by" or "previously used by" the plaintiffs.

DAG urges the court to interpret subparagraph 7(ii) to forbid use of all logos and trademarks that are (1) "substantially similar" to "Dynamic Airways,"(2) "substantially similar" to the marks "used by" DAG, or (3) "substantially similar" to any mark "previously used by" Dynamic Airways, LLC. In essence, DAG reads the phrase "substantially similar" in subparagraph 7(ii) to modify the phrases "that mark" (i.e., "Dynamic Airways"), "used by Dynamic Aviation, Inc.," and

---

[8] The court found at least four cases construing the phrase "substantially similar." Some courts found the phrase unambiguous. See Centennial Broad., LLC v. Burns, No. 6:06-CV-00006, 2006 WL 2850640, at *11 (W.D. Va. Sept. 29, 2006) (defining "substantially similar" with reference "to dictionary definitions and common usage"), aff'd, 254 F. App'x 977 (4th Cir. 2007); see also Almeda Mall, L.P. v. Shoe Show, Inc., 649 F.3d 389, 392 (5th Cir. 2011) (finding the phrase "substantially similar trade-name" could be given a "definite legal meaning"). Other courts found the phrase ambiguous. See Tech. Partners, Inc. v. Hart, 298 F. App'x 238, 244 (4th Cir. 2008) (noting that the term "business substantially similar" was ambiguous); B&B Advisory Services, L.L.C. v. Bombardier Aerospace Corp., No. 02-CV-2695, 2003 WL 21750663, at *3 (E.D. La. July 28, 2003) (noting that the phrase "substantially similar form" was ambiguous and had "several interpretations"). All four decisions rest their reasoning on the specific context in which the phrase was used. This mirrors well-established Virginia law, which requires that courts consider a term in the context it is used before deciding whether that term is ambiguous. See Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005) (noting that, under Virginia law, a contract provision is ambiguous "when, in context, it is capable of more than one reasonable meaning"). However, the court need not finally determine whether the phrase "substantially similar"—standing alone—is ambiguous in the MIPA. In this case, the ambiguity in subparagraph 7(ii) is created by the interrelated requirements that a mark be "substantially similar" and also be "used by" DAG or "previously used by" Dynamic Airways, LLC. Even if the phrase "substantially similar" is deemed unambiguous, which is not at all clear in this context, it would not fully resolve the ambiguities elsewhere in subparagraph 7(ii).

"previously used by the Company" (i.e., Dynamic Airways, LLC). Under this interpretation, DAG asks the court to list all the logos and trademarks used by DAG and all the logos and trademarks used by Dynamic Airways, LLC when it was owned by the Stoltzfuses. The court would then determine whether DIA's marks were "substantially similar" to any mark on the list. This interpretation would likely restrict DIA's use of the name "Dynamic International Airways," since that name is very similar to both DAG's "DYNAMIC AVIATION" marks and the name "Dynamic Airways" previously used by Dynamic Airways, LLC.

However, there is at least one alternate interpretation of subparagraph 7(ii). Under this alternate reading, subparagraph 7(ii) forbids only those logos and trademarks that are <u>both</u> "substantially similar" to "Dynamic Airways" <u>and</u> used by DAG or Dynamic Airways, LLC. This interpretation reads the phrase "substantially similar" to modify only the phrase "that mark"(i.e., "Dynamic Airways"), and reads the requirement that marks be "used by" DAG or "previously used by" Dynamic Airways, LLC as independent conditions. This is the argument effectively advanced by Kraus and DIA—Kraus testified that he never believed DAG had trademark rights to the name "Dynamic International Airways" and understood subparagraph 7(ii) to forbid only those names DAG and Dynamic Airways, LLC had used in commerce.

The court's analysis under this second interpretation changes dramatically. First, the court would determine whether DIA was using a logo or trademark that was "substantially similar" to the name "Dynamic Airways." If so, the court would then determine whether that "substantially similar" mark was a mark used by DAG or previously used by Dynamic Airways, LLC. Only marks that met both requirements would be barred. Use of the name "Dynamic International Airways" is unlikely to be captured under this second interpretation, since "Dynamic International Airways" was never used by DAG and was not previously used by Dynamic Airways, LLC.

Arguably, either of these interpretations is a reasonable reading of subparagraph 7(ii). Faced with at least two reasonable constructions of the contract—and lacking any context to interpret the interrelated requirements that a mark be "substantially similar," "used by" and "previously used by"—the court finds the language of subparagraph 7(ii) ambiguous. See Allen, 229 Va. at 593, 331 S.E.2d at 475 (affirming admission of extrinsic evidence where there was "uncertainty concerning the subject matter to which the [contract] language was intended to apply"); see also Nehi Bottling Co., Inc. v. All-Am. Bottling Corp., 8 F.3d 157, 162 (4th Cir. 1993) (applying Virginia law to find a sales contract ambiguous where the parties failed to define the term "Purchased Assets" and never quantified the phrase "substantially all the assets"); SER Sols., Inc. v. Masco Corp., 103 F. App'x 483, 488 (4th Cir. 2004) (applying Virginia law to find that the term "correctly" was "ambiguous and indefinite" and "is meaningful to the contracting parties only when it is considered in its larger context"); Prospect Dev. Co., 258 Va. at 84–85, 515 S.E.2d at 296 (finding real estate sales contract ambiguous where it failed to define the term "premium lot"). Further, the mere presence of an integration clause in the MIPA does not make subparagraph 7(ii) any less indefinite, nor does it prohibit admission of extrinsic evidence to explain the ambiguity. Prospect Dev. Co., Inc. v. Bershader, 258 Va. 75, 84–85, 515 S.E.2d 291, 296 (1999). As such, the court will consider extrinsic evidence "to establish the real contract between the parties." Tuomala, 252 Va. at 374, 477 S.E.2d at 505.

During the evidentiary hearing on February 10–11, 2016, both DAG and DIA offered extensive evidence about the negotiations over subparagraph 7(ii) in the MIPA. This evidence largely involves email communications between Kraus, Wayshner, and senior executives at DAG. In these emails, the parties discussed whether DIA could continue use of "Dynamic" in its name. For example, in an email on April 29, 2014, Merle Zook, an executive at DAG, emailed Kraus about

DIA's failure to change its name from "Dynamic Airways" as required by the original Purchase

Agreement. Zook wrote:

> The name change could and should happen immediately . . . Our understanding is that a DBA is acceptable and could be pending a formal name change of the LLC. Revenue flights were not to occur using the Dynamic brand, and we let it happen. It simply cannot continue, as we are two distinctly different businesses. One unfortunate incident incurred by Dynamic Airways could have a significant adverse impact on the reputation of Dynamic Aviation.

Def. Ex. FF, ECF No. 55-15, at 4. Kraus responded on May 8, 2014, stating in part:

> There are 20 aviation companies with Dynamic in the name. I had hoped we could keep the name at least temporarily to avoid complications. As a note one of the complications is that dynamic airways.com is re-directed to dynamicaviation.com and it confuses people on who we are. We have bought airdynamic.com and would like to use for the US380. Do you have objections to using something like "air Dynamic" [sic], Dynamic International Airways (DIA)) [sic], or something similar?

Id. Zook replied to Kraus on May 14, 2014:

> Just need to speak with our lawyer tomorrow about your proposal for AirDynamic [sic]. If he is good, we are good.

Def. Ex. I, ECF No. 55-20, at 1. One day later, on May 15, 2014, Zook emailed Kraus again:

> "Paul, please see Jeff's comments below . . . we are prepared to cooperate with the modification on the name as you proposed. It really needs to come in the form of an amendment to the purchase agreement and include Jeff's thoughts below."

Def. Ex. J, ECF No. 55-21, at 1. Zook's May 15 email included a forwarded email from Jeff Lenhart, counsel for DAG, which stated:

> Merle, following up on our earlier conversation, I believe that the use of the trade name "Air Dynamic" is sufficiently distinct from Dynamic Airways, and especially Dynamic Aviation, so that it is unlikely to cause confusion in the stream of commerce – although that could vary with the circumstances. Our consent to their use of that name should be memorialized in an addendum to the purchase agreement, just so there is no misunderstanding as to exactly what we are consenting to. Additionally, I think the agreement should reaffirm their commitment to take all actions, in public and private,

> necessary and appropriate to disassociate Air Dynamic from
> Dynamic Airways and Dynamic Aviation.

Id.

After these emails were exchanged, the parties began negotiating a trademark licensing

agreement that would supplement the original Purchase Agreement and the MIPA, which at that

time was still being negotiated by the parties. The proposed licensing agreement granted DIA the

right to use the names and marks "Dynamic International Airways" and "Air Dynamic" for a period

of 180 days. Pl. Ex. 17, ECF No. 56-17, at §§ E, 6(a). However, DAG reserved the right to cancel

the license if there was evidence of confusion among DAG's customers. Id. at § 1(f).

In an email dated July 24, 2014, Kraus forwarded an email from DIA's outside counsel to

Wayshner, expressing reservations about the licensing agreement. In that email, DIA's counsel

noted that the licensing agreement gave DAG "excessive" control over DIA's use of the marks. Pl.

Ex. 39, ECF No. 56-39, at 1–2. Wayshner responded to these concerns the same day, stating:

> Paul, as you know, Mike [Stoltzfus] is very concerned about the name
> use. We are allowing you to use the two Dynamic related names you
> selected whereas we were under no obligation to do so at all. You
> had previous [sic] agreed to not use any Dynamic associated name.
> Yes, we want control of how you use the name in exchange for our
> agreement to let you do so. Maybe your attorney is unaware of the
> history.

Id. at 1–3. In another section of that same email, Wayshner confirmed that DAG required the right

to terminate the trademark license if there was evidence of customer confusion, noting that DAG

"was granting you the right to use a name closely linked to our own. If your name selection/actions

are negatively impacting our business we want to be able to rectify the situation." Id. at 3.

Negotiations over the trademark licensing agreement were intertwined with negotiations

over the MIPA, and communications about one agreement often referenced the other. For

example, Kraus emailed Wayshner with a draft Letter of Agreement ("LOA") for the MIPA on July

15, 2014, while negotiations on the trademark licensing agreement were still ongoing. The July 15

draft of the LOA addressed the name usage issue:

> **Name Usage:** DA [Dynamic Airways] shall immediately discontinue
> the use of the name Dynamic Airways LLC, or any similar derivation
> thereof. DA shall use the name Air Dynamic, Dynamic International
> Airways, or any other non-Dynamic Airway names. Any logo/font is
> [sic] used for Air Dynamic or Dynamic International Airways shall
> not be similar to that used for Dynamic Aviation or previously for
> Dynamic Airways.

Def. Ex. M, ECF No. 55-24, at 2. Wayshner responded later that day, stating in part:

> [DAG executives] tell me that in the aviation world, "Dynamic" is a
> registered trademark of Dynamic Aviation. Therefore for your use of
> Air Dynamic or Dynamic International Airways, they will have to
> grant you authority to use the name via a licensing agreement.

Def. Ex. N, ECF No. 55-25, at 1. Wayshner's July 15 email was accompanied by a red-lined version

of the LOA, which made the following underlined changes to Kraus's draft LOA:

> **Name Usage:** DA [Dynamic Airways] shall immediately, <u>however in
> no event in more than 30 days from the date hereof,</u> discontinue the
> use of the name Dynamic Airways LLC, or any similar derivation
> thereof. DA shall use the name Air Dynamic, Dynamic International
> Airways, or any other non-Dynamic Airway names. Any logo/font is
> [sic] used for Air Dynamic or Dynamic International Airways shall
> not be similar to that used for Dynamic Aviation or previously for
> Dynamic Airways. <u>DAG shall provide a licensing agreement for the
> use of the name "Dynamic," to be executed by both parties, in Air
> Dynamic and Dynamic International Airlways [sic].</u>

Id. at 2. An early draft of the MIPA—which Wayshner emailed to Kraus on July 17, 2014—also

referenced the trademark licensing agreement. See Def. Ex. O, ECF No. 55-26, at ¶ 7. In this July

17 draft, paragraph 7 read:

> **7. Company Post-Closing Covenants.** Except as expressly
> provided in a non-exclusive license agreement substantially in the
> form attached hereto as Exhibit A, the Company shall immediately,
> but in no event later that [sic] August 15, 2014, discontinue all use of
> (i) the names "Dynamic Airways," "Dynamic International Airways,"
> or any derivative thereof, and (ii) any logo or trademark substantially
> similar to that mark used by Dynamic Aviation, Inc., or previously
> used by the Company while owned by Seller or its members.

> Further, the Company shall immediately upon closing make all necessary governmental or corporate filings to disassociate itself from the name Dynamic Airways to include, but not be limited to, all contracts and manuals.

Id. However, Wayshner's email (which accompanied the July 17 draft) stated:

> Paul – The Share Purchase Agreement is attached . . . I did advise the attorney that Dynamic International Airways should be stricken from 7.
>
> We will have a licensing agreement for your tomorrow. There is no formal trademark, however the name Dynamic Airways is registered to Dynamic Aviation Group. Their attorney feels that this registration could be extended to include the use of Dynamic in any aviation related name. For the benefit of both parties, he suggests we issue you a license agreement to use the names we have already agreed to. While the legal basis of all this could be debated, my view is we are giving you the names you want so it should not matter anyway.

Id. at 1.

Sometime in late July 2014, negotiations over the trademark licensing agreement broke

down. Nevertheless, the parties chose to move forward with their parallel negotiation on the MIPA.

On July 28, 2014, Wayshner emailed Kraus:

> Paul – I've looked at the MIPA and while you are required to change the name Dynamic Airways, it is silent on any other name. Dynamic Aviation feels strongly that they are entitled to and backed up legally for, the use of "Dynamic," in any aviation sense. **That said, they have agreed that you can call the airline Air Dynamic or Dynamic International Airways. Therefore, why argue over the licensing agreement format? Do we even need it?**

Def. Ex. Q, ECF No. 55-28, at 1–2 (emphasis added). Kraus responded on July 31, 2014:

> [D]ave is red [d]rafting the [MIPA] to avoid needing the licensing agreement. He agreed with your strategy. He will have today. And if okay with you, we'll get that signed and completed as well.

Def. Ex. R, ECF No. 55-29, at 1. Later drafts of the MIPA removed any reference to the trademark

licensing agreement. Inexplicably, however, language in these later drafts alternated between edits

explicitly allowing DIA to use the names "Dynamic International Airways" and "Air Dynamic" and

21

equally explicit edits striking such language. For example, Kraus sent Wayshner a draft of the MIPA on August 1, 2014, which stated: "[f]or the avoidance of doubt, Seller expressly agrees that the Company may use the names "Dynamic International Airways" and "AeroDynamic." Def. Ex. S, ECF No. 55-30, at ¶ 7. Four days later, on August 5, 2014, Wayshner returned a red-lined version of Kraus's August 1 draft that struck this sentence. Def. Ex. T, ECF No. 55-31, at ¶ 7. In an accompanying email, Wayshner stated:

> Please find attached our response to your last draft of the Membership Purchase Agreement. All changes are marked. We have had a great deal of discussion internally about the new name of Dynamic Airways and our agreement to your use of it. As no licensing agreement will be in effect, we feel the MIPA should also be silent on the names you use. You have already committed to change the name from Dynamic Airways. If we agree to your proposed name changes, it implies we have some authority to grant these names to you, thereby requiring a licensing agreement to do so, which we both have determined is not necessary. I want you to understand the logic behind our changes. Any questions please give me a call.

Id. at 1. Wayshner emailed Kraus again on August 22, 2014, with yet another draft of the MIPA:

> Dear Paul – Please find attached the revised MIPA for Dynamic Airways. It is silent on the name change with the exception that there is re-affirmation of the prior sales agreement—not to use the Dynamic Airways name. As you have informed me that you are no longer using the Dynamic airways name in any way, this should not be an issue.

Def. Ex. U, ECF No. 55-32, at 1. Kraus responded to Wayshner's August 22 email on August 26, 2014:

> Michael – We are changing the name to Dynamic International Airways immediately. We will forward the corporate filings when completed. Call me Tuesday to discuss other items and we'll get closed up. I am in GSO this week.

22

Def. Ex. V, ECF No. 55-33, at 1.[9]  The final draft of the MIPA was signed on October 9, 2014, and included the now-familiar language about name usage:

> **7. Company Post-Closing Covenants**:  On or before October 9, 2014, the Company shall discontinue the use of (i) the name "Dynamic Airways" and (ii) any logo or trademark substantially similar to that mark used by Dynamic Aviation, Inc., or previously used by the Company while owned by the Seller or the Seller's Members.

Pl. Ex. C, ECF No. 26-3, at ¶ 7.

DIA and DAG have widely differing interpretations of this extrinsic evidence.  For its part, DAG claims the emails show that subparagraph 7(ii) of the MIPA forbids any use of the "Dynamic" name, including "Dynamic Airways," "Dynamic International Airways," "Air Dynamic," or simply "Dynamic."  Both Zook and Michael Stoltzfus testified that they were adamant that DIA could not use any "Dynamic" name.  While Zook and Stoltzfus concede that DAG considered granting DIA a license to use the names "Dynamic International Airways" and "Air Dynamic," they argue that use of these two names was always contingent on a signed trademark licensing agreement.  When DAG and DIA failed to agree on a licensing agreement, Zook and Stoltzfus claim DAG reserved the right to restrict those names in subparagraph 7(ii) of the MIPA.  Specifically, Stoltzfus—who ultimately signed the MIPA on behalf of DAG—testified that he believed subparagraph 7(ii) and DAG's federal and common law trademark rights would prevent DIA from using the names "Dynamic International Airways," "Air Dynamic," or any other "Dynamic" name.

The testimony of Zook and Stoltzfus is buttressed by Wayshner, the third party broker hired by DAG.  Wayshner testified that he communicated with Kraus both via email and over the phone about the name usage issue.  These conversations began in approximately July 2014, and ran until the MIPA was signed in October 2014.  Wayshner claims he made it clear that DAG would never

---

[9] Zook testified that Wayshner never forwarded him the August 26 email from Kraus, in which Kraus states he is "changing the name to Dynamic International Airways immediately."

consent to DIA's use of the names "Dynamic International Airways" or "Air Dynamic" without a trademark licensing agreement, and informed Kraus as much once the parties abandoned the licensing agreement and decided to proceed only with negotiations on the MIPA.

Predictably, DIA has a different interpretation of the extrinsic evidence. DIA claims DAG agreed to DIA's use of the name "Dynamic International Airways," and that this agreement is reflected in subparagraph 7(ii) of the MIPA. DIA notes that the final language of this section did not explicitly forbid use of the name "Dynamic" and is silent on other potential names. Kraus admits that Wayshner told him he was required to stop use of "Dynamic Airways," but denies ever being told DIA could not use other "Dynamic" names. While Kraus agrees that DIA's use of "Dynamic International Airways" was initially discussed in the context of a licensing agreement, Kraus believes DAG acquiesced to DIA's use of that name in order to close on the MIPA.

In support, Kraus points to Wayshner's emails from July 28, (ECF No. 55-28), August 5 (ECF No. 55-31), and August 22 (ECF No. 55-29) as evidence that the MIPA gave DIA permission to use the name "Dynamic International Airways" without a licensing agreement. Kraus also claims that he informed Wayshner as early as August 26, 2014—which was after the parties abandoned discussions on the licensing agreement but before they signed the MIPA—that he intended to use the name "Dynamic International Airways." Def. Ex. V, ECF No. 55-33, at 1. Finally, Kraus testified that he believed DAG had no rights to the names "Dynamic International Airways," "Air Dynamic," or "Dynamic" because DAG had no registered trademarks for those marks. As such, Kraus believed DAG could not require him to sign a trademark licensing agreement to use these names.

In the court's view, neither DAG nor DIA fully grasp the factual inconsistencies in the extrinsic evidence. With respect to the names "Dynamic International Airways" and "Air Dynamic," there is some evidence the parties intended for subparagraph 7(ii) to bar their use by

24

DIA. Multiple emails between Wayshner and Kraus from June 2014 and early July 2014 state that the MIPA would forbid use of these two names absent a licensing agreement. Early drafts of the MIPA mirror this understanding. Wayshner also testified under oath that he made it clear that DAG would never grant DIA blanket rights to the names "Dynamic International Airways" or "Air Dynamic" in the MIPA. Were this the only extrinsic evidence before the court, subparagraph 7(ii) would clearly forbid use of the names "Dynamic International Airways" or "Air Dynamic."

On the other hand, Kraus flatly denies that Wayshner told him the MIPA would forbid use of "Dynamic International Airways" or "Air Dynamic." Further, the emails between Wayshner and Kraus from late July and August 2014 suggest DAG abandoned its position on the licensing agreement in order to close on the MIPA. For example, Wayshner's email from July 28, 2014, states that DAG "agreed" that DIA could use the names "Dynamic International Airways" or "Air Dynamic" even though the MIPA was "silent on any other name." Def. Ex. Q, ECF No. 55-28, at 2–3. Again on August 22, 2014, Wayshner emailed Kraus to tell him that subparagraph 7(ii) was "silent on the name change with the exception that there is re-affirmation . . . not to use the Dynamic Airways name" and assured him that "[a]s you have informed me that you are no longer using the Dynamic airways [sic] name in any way, this should not be an issue." Def. Ex. U., ECF No. 55-32, at 1. Kraus then responded to Wayshner on August 26, 2014, telling him that DIA was "changing the name to Dynamic International Airways immediately." Def. Ex. V, ECF No. 55-33, at 1. The record does not show that DAG responded to this August 26 email before Michael Stoltzfus signed the MIPA in October.

The breach of contract claim is fraught with ambiguity. Subparagraph 7(ii) of the MIPA is ambiguous. The extrinsic evidence that might establish the meaning of this paragraph is itself ambiguous. With respect to "Dynamic International Airways" and "Air Dynamic," there is some evidence that the parties intended for subparagraph 7(ii) to bar their use by DIA. Conversely, there

25

is evidence that DAG intended to relinquish any objection to DIA's use of these two names—or at least intended that this section would not contractually forbid DIA from using them. Because the court cannot resolve this factual dispute at this stage, it finds that DAG cannot clearly show that DIA's use of the name "Dynamic International Airways" or "Air Dynamic" is a breach of subparagraph 7(ii).

A somewhat different analysis applies to DIA's use of the name "Dynamic." DIA's primary logo uses the word "Dynamic" only. This logo is displayed on DIA's planes, its main website, and its advertising materials. DAG claims DIA use of "Dynamic" alone also breaches subparagraph 7(ii). However, for the reasons stated above, the meaning of subparagraph 7(ii) is ambiguous. There is nothing in the record, at this point, that clearly shows what the parties intended in subparagraph 7(ii) of the MIPA. Therefore, the court cannot find at this stage that use of the "Dynamic" name alone violates subparagraph 7(ii) of the MIPA.

However, there is an important difference between DIA's use of the name "Dynamic" and its use of the names "Dynamic International Airways" and "Air Dynamic." In the current record, there is evidence that the parties intended for subparagraph 7(ii) to allow use of "Dynamic International Airways" and "Air Dynamic." Executives at both companies frequently discussed these two names, and there is some evidence that DAG relinquished any objection to their use. In contrast, there is no evidence the parties intended to allow DIA's use of "Dynamic" as a stand-alone mark. The name "Dynamic" was not discussed in the trademark licensing agreement, was not discussed during the final negotiations on the MIPA, and there is no evidence that Kraus requested rights to use "Dynamic" alone.

Accordingly, while a future factfinder may construe subparagraph 7(ii) to authorize use of "Dynamic International Airways" or "Air Dynamic," no reasonable person could interpret subparagraph 7(ii) to likewise authorize use of the name "Dynamic" alone. Therefore, any

26

protection DAG has against DIA's use of "Dynamic" is not affected by the ambiguity surrounding subparagraph 7(ii). This distinction has important ramifications for DAG's trademark claim, as discussed in Part III.B of this opinion.

In sum, the court finds the extrinsic evidence insufficient, at this point, to establish the actual contract between the parties. As such, DAG cannot clearly show a likelihood of success on the merits of its breach of contract claim as to subparagraph 7(ii) of the MIPA. Ramsey v. Bimbo Foods Bakeries Distribution, Inc., No. 5:14-CV-26-BR, 2014 WL 3408585, at *8 (E.D.N.C. July 10, 2014) (denying a preliminary injunction where a "factual dispute" remained about the defendant's contract obligations); Allegra Network LLC v. Reeder, No. 1:09-CV-912, 2009 WL 3734288, at *3 (E.D. Va. Nov. 4, 2009) (same). In so holding, the court makes no finding as to DAG's ability to succeed on this aspect of its breach of contract claim at a later date.

### 3. Damages from Breach

Finally, DAG must show that any alleged breach of the MIPA caused it some injury. As DAG has carried its burden to show breach only with respect to subparagraph 7(i) of the MIPA, the court addresses damages associated with DIA's use of "Dynamic Airways." DAG contends that DIA's refusal to cease use of "Dynamic Airways" has led to "rampant" market confusion between the two companies. ECF No. 46, at 3. This market confusion has allegedly damaged DAG's competitive standing in the airline industry and led to the loss of customer goodwill, reputation, and future business opportunities. In essence, these contract damages are the same damages DAG claims under the irreparable harm prong, as noted below, and are sufficient to state a claim for breach of contract. Whether these damages are sufficient to justify a preliminary injunction is an issue discussed in Part III.C of this opinion.

#### 4. Summary

For the reasons stated above, DAG has shown that DIA continues to use the name "Dynamic Airways" in violation of subparagraph 7(i) of the MIPA, and has suffered damages as a result of this breach. Thus, DAG has made a clear showing that it is likely to succeed on this portion of its breach of contract claim. However, factual disputes remain on DAG's allegation that DIA's use of the name "Dynamic International Airways," "Air Dynamic," or "Dynamic" is a breach of subparagraph 7(ii) of the MIPA. As such, DAG cannot show a likelihood of success as to this aspect of its contract claim.

### B. Likelihood of Success on Claim for Trademark Infringement

Having concluded that DAG is likely to succeed on some portion of its contract claim, the court turns next to DAG's claim for trademark infringement. To succeed on an infringement claim, DAG must prove (1) that it has a valid, protectable trademark and (2) that the defendant's use of a "reproduction, counterfeit, copy, or colorable imitation" of that trademark creates a "likelihood of confusion." Petro Stopping Centers, L.P. v. James River Petroleum, Inc. 130 F.3d 88, 91 (4th Cir. 1997) (citing 15 U.S.C. § 1114(1)). "In applying this test, it is not necessary for the owner of the registered trademark to show actual confusion: '[t]he test is whether there is a likelihood of confusion.'" Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984) (citing Dwight S. Williams v. Lykens Hosiery Mills, 233 F.2d 398, 401 (4th Cir. 1956)). "If the use of the contested mark is likely to cause such [a] 'likelihood,' the owner of the registered trademark is entitled to relief." Id.

### 1. Valid, Protectable Trademark

To satisfy the first prong of its infringement claim, DAG must show that it has a valid, protectable trademark. While not necessary to show ownership, federal registration of a trademark is "prima facia evidence that the registrant is the owner of the mark." George & Co., LLC v.

Imagination Entm't Ltd., 575 F.3d 383, 400 n.15 (4th Cir. 2009). In this case, DAG owns two registered trademarks for "DYNAMIC AVIATION:" FTR Nos. 3316437 and 4532409. Both are "word marks" for the phrase "Dynamic Aviation." FTR No. 3316437 includes the words "Dynamic Aviation" and was registered on October 23, 2007. Ex. A, ECF No. 26-1. FTR No. 4532409 was registered on May 20, 2014 and includes the phrase "Dynamic Aviation" placed next to a revolving globe. Ex. B, ECF No. 26-2. DIA does not dispute that the two registered trademarks for "DYNAMIC AVIATION" are valid, protectable marks. ECF No. 55, at 11–12.[10] As such, the court finds that DAG has made a clear showing that it is likely to succeed on the first prong of its infringement claim. See Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1124 (9th Cir. 2014) ("When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met.").

With that said, DAG appears to claim ownership of other common law trademarks. For example, DAG notes throughout its briefs that it has a protectable mark in the name "Dynamic" alone and generally references the "Dynamic marks" in its allegations. See, e.g., ECF No. 46, at 17–18. To be sure, ownership of a mark is not dependent on registration, and can also flow from prior use, provided a plaintiff "show[s] that it has actually used the designation at issue as a trademark."

---

[10] Indeed, because one "Dynamic Aviation" mark has been registered for more than five years, DAG's right to exclusive use is now "incontestable." 15 U.S.C. § 1065. Further, that DAG's registered trademarks are for specific services is of no moment, at least for purposes of the ownership prong. "Although the *validity* of a registered mark extends only to the listed goods or services, an owner's *remedies* against confusion with its valid mark are not so circumscribed." Applied Info. Scis. Corp. v. eBAY, Inc., 511 F.3d 966, 971 (9th Cir. 2007) (emphasis in original). As the Ninth Circuit made clear:

> "[A] plaintiff trademark owner must establish a valid, protectable interest in order to proceed to the second prong of the trademark infringement analysis—the likelihood of confusion resulting from the defendant's alleged infringing use. Having established a protectable interest by proving it is the owner of a registered trademark, the owner does not additionally have to show that the defendant's allegedly confusing use involves the same goods or services listed in the registration.

Id. at 972 (collecting cases); see also Synergistic Int'l, LLC v. Korman, 470 F.3d 162, 173 (4th Cir. 2006) (noting that registration of a mark should be "broadly construed" and not "limited to the text of the mark's registered purpose").

29

MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 341 (4th Cir. 2001); see also Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc., 332 F.3d 264, 267 (4th Cir. 2003) ("At common law, trademark ownership is acquired by actual use of the mark in a given market."). However, DAG failed to offer evidence that it has used a mark other than "DYNAMIC AVIATION" in its business. For example, Zook testified at the evidentiary hearing that DAG uses the "DYNAMIC AVIATION" marks throughout its operations, but admitted that DAG did not operate flights under other "Dynamic" names. Michael Stoltzfus testified similarly, noting that DAG often provides aircraft, pilots, and maintenance services to third party partners, who then operate the aircraft under their own logo or trademark. This is not to say that DAG cannot prove ownership of a common law trademark at a later date. However, on the record before it, the court must analyze DAG's infringement claim only with reference to DAG's registered trademarks in "DYNAMIC AVIATION."

## 2. Likelihood of Confusion

To satisfy the second prong of its infringement claim, DAG must show that DIA's use of a reproduction or colorable imitation of DAG's "DYNAMIC AVIATION" marks creates a "likelihood of confusion." At the outset, there is some uncertainty as to what marks DAG seeks to enjoin. In its briefs and during argument, DAG claimed DIA should be enjoined from using all "Dynamic marks." Yet, DAG never specified the exact infringing mark it claims DIA is using. The record shows three options: DIA's "DYNAMIC" mark (ECF No. 58-7, at 5–7), its "DYNAMIC INTERNATIONAL AIRWAYS" mark (ECF No. 55-3, at 2), and its "DYNAMIC AIRWAYS" mark (ECF No. 58-8). For several reasons, the court will analyze only DIA's use of the "DYNAMIC" mark.

First, there is no evidence that DIA uses the mark "DYNAMIC AIRWAYS" with any regularity. Moreover, the court has already found that use of the name "Dynamic Airways" is barred

by subparagraph 7(i) of the MIPA. Because DAG can successfully enjoin use of this mark via its contract claim, there is no need to decide if DAG can also enjoin use of the "DYNAMIC AIRWAYS" mark via its trademark claim.

Second, it is not clear to what extent DIA uses the mark "DYNAMIC INTERNATIONAL AIRWAYS" in its business. To be sure, DIA's legal name is now "Dynamic International Airways, LLC," and Kraus testified that the words "Dynamic International Airways" appear in small font directly above the landing gear on certain DIA planes. However, the current record does not show whether the "DYNAMIC INTERNATIONAL AIRWAYS" mark appears with any regularity on DIA's planes, its website, or in the marketing materials provided to consumers. Instead, it appears that DIA's primary logo shortens "Dynamic International Airways" to simply "Dynamic."

More importantly, DAG's ability to enjoin DIA's use of "DYNAMIC INTERNATIONAL AIRWAYS" is intertwined with the dispute over subparagraph 7(ii) in the MIPA. As noted above, there is some evidence that DAG contracted away its rights to "DYNAMIC INTERNATIONAL AIRWAYS" by agreeing to DIA's use of that name. Whatever trademark protection DAG has against DIA's use of the "DYNAMIC INTERNATIONAL AIRWAYS" mark depends, in large part, on the proper construction of the MIPA. The court thus finds it necessary to reserve decision on DIA's "DYNAMIC INTERNATIONAL AIRWAYS" mark until it resolves the factual disputes over DAG's contract claim.

This leaves DIA's "DYNAMIC" mark. Unlike the mark for "DYNAMIC INTERNATIONAL AIRWAYS," there is strong evidence that DIA uses the "DYNAMIC" mark as its primary logo. In fact, DAG's evidence for consumer confusion focuses on DIA's use of "DYNAMIC" on its airplanes. Moreover, DAG's ability to enjoin DIA's use of "DYNAMIC" is not entangled with the contract dispute. There is no evidence that DAG surrendered its right to object to DIA's use of "DYNAMIC" in subparagraph 7(ii) of the MIPA. As such, the factual

disputes surrounding DAG's contract claim do not prevent DAG from pursuing a simultaneous infringement claim based on DIA's use of the "DYNAMIC" mark. The court will therefore limit the scope of its confusion analysis—at least for purposes of the current motion—to DIA's use of the "DYNAMIC" mark alone.

With that settled, the court turns to the crux of DAG's infringement claim: whether DIA's use of the "DYNAMIC" mark creates a likelihood of confusion with DAG's "DYNAMIC AVIATION" marks. "A likelihood of confusion exists if 'the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" George & Co., 575 F.3d at 393 (citing CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006)). Importantly, a court may not "indulge in a prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers." CareFirst, 434 F.3d at 267 (internal citation omitted). "Rather, [a court] look[s] to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." Id. (citing What–A–Burger of Va., Inc. v. Whataburger, Inc., 357 F.3d 441, 450 (4th Cir. 2004)).

The Fourth Circuit provides nine factors that inform the analysis of a likelihood of confusion:

> (1) [T]he strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 153 (4th Cir. 2012) (citing George & Co., 575 F.3d at 393). However, these factors are not exhaustive and "there is no hard and fast rule that obligates the district court to discuss each . . . factor." Id. at 154. Nor must every factor favor the plaintiff in

32

order to find a likelihood of confusion. <u>Synergistic Int'l, LLC v. Korman,</u> 470 F.3d 162, 171 (4th Cir. 2006).

### (i). Strength of DAG's Marks

First, the court considers the strength and distinctiveness of the "DYNAMIC AVIATION" marks. "Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." <u>George & Co.,</u> 575 F.3d at 393. This strength factor has two components: conceptual strength and commercial strength. <u>Id.</u>

A mark's conceptual strength is determined by its classification as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary/fanciful. <u>Id.</u> at 394. Generic marks receive no protection, descriptive marks receive occasional protection, and suggestive, arbitrary, and fanciful marks are highly protected. <u>Id.</u> As neither DAG nor DIA argues that "DYNAMIC AVIATION" is generic or fanciful, the court will ignore these categories in its analysis of conceptual strength.

Arbitrary marks include words in common usage, but "do not suggest or describe any quality, ingredient, or characteristic of the goods they serve." <u>Sara Lee Corp. v. Kayser-Roth Corp.,</u> 81 F.3d 455, 464 (4th Cir. 1996). Examples of arbitrary marks include "Tea Rose® flour, Camel® cigarettes, and Apple® computers." <u>Id.</u> Descriptive and suggestive marks are more difficult to define. "[G]enerally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." <u>Variety Stores, Inc. v. Wal-Mart Stores, Inc.,</u> No. 5:14-CV-217, 2015 WL 8975616, at *3–4 (E.D.N.C. Dec. 8, 2015) (citing <u>Pizzeria Uno,</u> 747 F.2d at 1528). Examples of suggestive marks include "Coppertone®, Orange Crush®), and Playboy®," while examples of descriptive marks include "After Tan post-tanning lotion, 5 Minute glue, [and] King Size men's clothing." <u>Sara Lee,</u> 81 F.3d at 464.

Importantly, "descriptive marks are not inherently distinctive" and require evidence of "secondary meaning before they receive trademark protection." George & Co., 575 F.3d at 394. The mere fact that a trademark has become incontestable does not, by itself, show that the mark is suggestive, rather than descriptive. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 935, (4th Cir. 1995).[11] Finally, when a registered trademark includes a disclaimed word (in this case, "Aviation"), a court "look[s] mainly at the use of the dominant word ("Dynamic") in making its assessment of whether a mark is "suggestive" or "descriptive." Synergistic Int'l, 470 F.3d at 171–72.[12]

In this case, the court finds the "DYNAMIC AVIATION" marks suggestive, and therefore entitled to a higher level of protection. The term "Dynamic" as applied to aviation services "requires some operation of the imagination to connect it with the goods." Pizzeria Uno, 747 F.2d at 1528. "Dynamic" is associated with "force," "action" and "energetic." See Oxford English Dictionary Online, http://www.oed.com/view/Entry/58818, (last accessed March 11, 2016). These terms have no inherent association with DAG's business, but instead "project a favorable and idealistic image with which a prospective user might indentify." Sara Lee, 81 F.3d at 464. Of course, the term "Dynamic" could, in some sense, describe DAG's effort to provide fast-acting and innovative aviation services. Yet, the court finds the connection between DAG's services and the term "Dynamic" more nuanced than a name that directly imparts information, requiring the

---

[11] DAG appears to claim that the "suggestiveness" of its marks is now indisputable because both marks are registered and one has become incontestable under federal law. ECF No. 46, at 18. The court disagrees. Registration and incontestability "affect [ ] the validity of the trademark but do [ ] not establish the likelihood of confusion necessary to warrant protection from infringement. Likelihood of consumer confusion remains an independent requirement for trademark infringement." Lone Star, 43 F.3d at 935. To be sure, the United States Patent and Trademark Office's ("USPTO") registration of a mark is often instructive in distinguishing "descriptive" and "suggestive" marks. For example, "[i]f the USPTO believes a mark is descriptive, the registrant must provide evidence of secondary meaning before the USPTO will grant registration." George & Co., 575 F.3d at 395. Evidence that the USPTO granted registration without proof of secondary meaning can thus be prima facie evidence that a mark is suggestive, rather than descriptive. Id. However, there is no evidence in the record showing that the USPTO granted registration for DAG's marks without requiring evidence of secondary meaning. As such, the court is unable at this stage to draw any conclusions as to the effect, if any, of the USPTO's registration on the "suggestiveness" of DAG's marks.

[12] The registrations for both "DYNAMIC AVIATION" marks note that DAG disclaimed rights to use the word "Aviation" separate from the full mark. Ex. A, ECF No. 26-1; Ex. B, ECF No. 26-2.

consumer to engage in a mental exercise to associate the marks with DAG's operations. See Synergistic Int'l, 470 F.3d at 171–72 (affirming that GLASS DOCTOR mark was suggestive in context of windshield repair services); Playtex Products, Inc. v. Georgia-Pac. Corp., 390 F.3d 158, 164 (2d Cir. 2004) (finding that "WET ONES" mark was suggestive in context of wet wipes industry, noting that the term "Wet Ones"—while descriptive—did not "itself conjure up the image of a towelette"), superseded on other grounds by statute, Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97 (2d Cir. 2009); Variety Stores, 2015 WL 8975616, at *3–4 (finding "BACKYARD" mark suggestive in the context of outdoor grill and grill accessories). Cf. Dynamic Model Products, Inc. v. Circus Hobbies, Inc., No. 89-CV-2352, 1990 WL 265987, at *2 (C.D. Ill. Apr. 11, 1990) (finding that "Dynamic" was an arbitrary or fanciful mark in context of model boat industry).

The court recognizes that DIA provided evidence of third party use of marks similar to "DYNAMIC AVIATION." This evidence includes copies of registered trademarks, trademark applications, and website screenshots that show use of the word "Dynamic" by other aviation companies. See ECF Nos. 11-15, 11-16, 11-17, 58-3. As DIA notes, frequent use of a mark in the same industry can indicate a mark's "lack of conceptual strength." CareFirst, 434 F.3d at 270. For example, the Fourth Circuit in CareFirst cited the "substantial third party use of the words 'Care,' 'CareFirst,' 'First,' and 'First Care' in the health care industry" to find that the plaintiff's registered mark for "CAREFIRST" was not conceptually strong. Id. DIA claims its evidence shows that the "DYNAMIC AVIATION" marks are part of a "crowded field" in the aviation industry and are thus "conceptually weak." ECF No. 55, at 12. However, the court does not find the third party use in this case as conclusive as DIA suggests.

First, "the mere citation of third party *registrations* is not proof of third party *uses* for the purpose of showing a crowded field and relative weakness." 2 McCarthy on Trademarks and Unfair

35

Competition § 11:89 (4th ed.) (emphasis in original). To the extent that DIA's evidence shows only third party registration of "Dynamic"-related marks, rather than third party use of those marks, the court affords it little weight. Second, the great majority DIA's examples involve companies that use the term "Dynamics," not "Dynamic." While both "Dynamic" and "Dynamics" share an association with "physical force," the term "Dynamics" is more closely associated with the scientific study of energy and moving objects, not "force" or "energy" itself. See Oxford English Dictionary Online, http://www.oed.com/view/Entry/58824, (last accessed March 11, 2016). This is likely why DIA's examples include marks from many aircraft engineering or manufacturing companies—for example, "AIRGROUP DYNAMICS, INC," "AUTOMATED DYNAMICS," and "FALCON DYNAMICS, INC"—and not companies like DAG who operate and service aircraft. While the distinction between "Dynamics" and "Dynamic" does not render irrelevant evidence of third party use of "Dynamics," it distinguishes this case from CareFirst, where multiple third party marks used words identical to those found in the plaintiff's mark. 434 F.3d at 270.

With that said, DIA offers some evidence of third party use of "Dynamic." This includes a registered mark for "AERODYNAMIC PRIVATE JET MANAGEMENT" and common law marks like "AeroDynamic Aviation," "Dynamic AeroSport," "Dynamic Aviation – Helicopters," and "Dynamic Jet Charter." ECF No. 11-17. While this third party use does not automatically render the "DYNAMIC AVIATION" marks weak, it lessens their conceptual strength. See Fuel Clothing Co., Inc. v. Nike, Inc., 7 F. Supp. 3d 594, 612 (D.S.C. 2014) (finding the strength of a suggestive mark was "slightly weakened" by evidence of third party use of the mark). Accordingly, while the court finds DAG's marks at least suggestive and thus inherently distinctive, the marks' protection is somewhat weakened by third party use of similar marks.

A mark's strength does not end with its conceptual strength; a court must also consider a mark's commercial strength. The analysis of commercial strength "looks at the marketplace and

36

asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." CareFirst, 434 F.3d at 269. This analysis is similar to that used to determine secondary meaning, and often involves six factors: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." George & Co., 575 F.3d at 395 (citing Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990)). In this case, both DAG and DIA largely ignored the commercial strength issue. DAG claims it has used the "Dynamic Aviation" name for approximately nineteen years, has spent "millions" of dollars advertising its brand, and has, on occasion, pursued legal action against parties who attempted to trade on the "Dynamic" name. In addition, Michael Stoltzfus testified that DAG conducts various consumer surveys to test the strength of its brand recognition. However, these general claims were supported by little tangible evidence of commercial strength, and there were no consumer studies or sales reports submitted for review. In light of this thin record, the court can draw no conclusions as to the commercial strength of the "DYNAMIC AVIATION" marks. Therefore, after balancing the conceptual strength of the marks with the minor evidence of third party use and the marks' unknown commercial strength, the court concludes that the strength factor is either neutral or, at most, slightly favorable to DAG.

### (ii). Similarity Factors

The next series of factors are often called the "similarity" factors, and consider the similarity of the marks to consumers, the similarity of the goods and services provided under those marks, and the similarity in facilities and advertising used by the markholders. To determine similarity of the marks, courts analyze any "similarity in sight, sound, and meaning which would result in confusion." George & Co., 575 F.3d at 396. "[A]s the similarities between two marks increase, so too does the

37

likelihood of confusion." Pom Wonderful, LLC v. Hubbard, 775 F.3d 1118, 1127 (9th Cir. 2014). At the outset, DAG's "DYNAMIC AVIATION" marks are obviously similar to DIA's "DYNAMIC" mark, in that each mark prominently features the word "Dynamic." As the Fourth Circuit notes, "greater weight [is] given to the dominant or salient portions of the mark" in evaluating similarity. Lone Star, 43 F.3d at 936. In this case, DAG was required to disclaim "AVIATION" apart from its use in "DYNAMIC AVIATION." As such, the dominant word in DAG's marks is "DYNAMIC," just as the dominant term in DIA's mark is also "DYNAMIC." Since the dominant term in a mark is the one most likely to impart meaning to the consumer, the identical use of "DYNAMIC" in these marks "is a strong indicator of that similarity in appearance and sound which would result in confusion." Pizzeria Uno, 747 F.2d at 1534–35 (finding that Pizzeria Uno and Taco Uno were confusingly similar based, in large part, on their use of identical dominant terms).

DIA argues that its use of a different color, font, and logo sufficiently distinguishes its mark from the "DYNAMIC AVIATION" marks. These differences are certainly relevant. See, e.g., 4 McCarthy on Trademarks and Unfair Competition § 23:52 (4th ed.) (noting that courts should "consider not only the similarity of the accused word marks, but also the similarity of the lettering style, color and format and any accompanying background matter"). But the court does not find that these graphic dissimilarities overcome the identical use of the same dominant word in both marks. Choice Hotels Int'l, Inc. v. Zeal, LLC, No. 4:13-CV-1961, 2015 WL 5781507, at *9 (D.S.C. Sept. 29, 2015) (noting that defendant's use of different colors and fonts was "not sufficient to overcome the substantial likelihood of confusion that results from the incredible similarity in the wording of the marks"). As such, the court finds the similarity between the marks favors a finding of a likelihood of confusion.

As to the similarity of services, it is clear that "[a] markholder is not limited to protection of only the products listed in its application to USPTO or by the resulting certificate of registration." Rebel Debutante LLC v. Forsythe Cosmetic Group, Ltd., 799 F. Supp. 2d 558, 573 (M.D.N.C. 2011) (citing Synergistic Int'l, 470 F.3d at 172–73). As such, the parties' services "need not be identical or in direct competition with each other," George & Co., 575 F.3d at 397, but only "related . . . [such that] the public is likely to attribute the products and services to a single source." Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 227 F. App'x 239, 244 (4th Cir. 2007); see also IDV N. Am., Inc. v. S & M Brands, Inc., 26 F. Supp. 2d 815, 826 (E.D. Va. 1998) (noting that goods can be "related" when consumers believe an infringer's goods are "sponsored" or "approved" by the senior user). Courts have found similarity of services where the parties operated a sit-down restaurant and a fast-food restaurant, Pizzeria Uno, 747 F.2d at 1535, where the parties produced a car detergent and dish detergent sold through the same retailer, Clinton Detergent Co. v. Procter & Gamble Co., 302 F.2d 745, 746 (C.C.P.A. 1962), where parties manufactured greeting cards and gift products, Renaissance Greeting Cards, 227 F. App'x at 244, and where the parties ran a law firm and an online news organization. Inst. for Justice v. Media Grp. of Am., LLC, No. 1:15-CV-1410, 2015 U.S. Dist. LEXIS 161264, *22 (E.D. Va. Nov. 30, 2015).

In this case, the services provided by DAG and DIA do not directly compete against one another in the aviation industry. DIA operates a commercial passenger and transport service geared towards the general public. In contrast, DAG's business includes airborne intelligence gathering, surveillance, data acquisition, fire management, insect sterilization, passenger charter, and medevac services. These specialized aviation services generally target a select group of corporate and government consumers. However, DAG previously provided passenger service to the public—in fact, as the former owner of Dynamic Airways, LLC, DAG operated some of the same routes currently served by DIA. Moreover, DAG currently operates passenger flights between New York

39

and Boston through its partnership with Beacon, a third party aviation company, and intends to expand those passenger operations in the near future. While DAG's passenger service also targets corporate consumers, its plans for expansion include efforts to capture a wider range of domestic consumers. Further, Stoltzfus testified that DAG plans to place the "DYNAMIC AVIATION" mark on its passenger flights in the future. Stoltzfus also noted that DAG hopes to expand into international markets, specifically Brazil, where he believes DIA's history of poor performance will affect DAG's ability to receive the necessary certifications from the Brazilian government.

DIA seizes on these differences in service, arguing that DAG and DIA "offer different services to different consumers through different channels." ECF No. 55, at 13. However, services need not directly compete in order for a consumer to attribute the services to a single source. Both DAG and DIA generally offer aviation services to consumers, including passenger service, that are sufficiently related such that a reasonable consumer is likely to associate the services to a single company. Though the court agrees that the specialized nature of DAG's current business lessens, to some degree, the likelihood of confusion, it also notes that "[a]n important function of this 'related goods' concept is to protect trademark owners' ability to expand into associated markets in the future." Renaissance Greeting Cards, 227 F. App'x at 244; see also CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 681 (7th Cir. 2001) (noting the need "to protect the [markholder's] ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future"). DAG has demonstrated that it intends to further expand into passenger markets. These plans for expansion, when considered alongside DAG's prior passenger operations, show that the similarity of services factor weighs in favor of DAG.[13]

---

[13] DIA cites several persuasive cases to claim that services "in the same market but in different submarkets" cannot be "similar services" for purposes of this factor. ECF No. 55, at 14 (citing Nat'l Distillers Products Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474 (S.D.N.Y. 2002), and Worthington Foods, Inc. v. Kellogg Co., 732 F. Supp. 1417 (S.D. Ohio 1990)). The court finds these cases distinguishable. In both National Distillers and Worthington Foods, the plaintiff offered no evidence that it intended to expand into markets closely related to that of the alleged infringer. See Nat'l Distillers,198 F. Supp. 2d at 482 (noting that there was not a "significant likelihood" that the

The court must also consider any similarity in facilities and advertising. Neither of these factors was well-briefed by the parties. DAG claims this factor favors an injunction because both parties operate "facilities necessary to provide air transport service." ECF No. 46, at 18. However, neither DAG nor DIA offered evidence that they connect with consumers through their brick-and-mortar locations, and there is no evidence that either parties' physical location plays a role in the current dispute. The court thus affords little weight to this factor.

To compare advertising, the Fourth Circuit looks to "the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements." CareFirst, 434 F.3d at 273. For example, several district courts have held that use of the Internet by both parties can show similarity in advertising. See Inst. for Justice, 2015 U.S. Dist. LEXIS 161264, at *23–24 (finding it "significant that both parties are using the Internet to provide the relevant services and that the domain names of the parties' websites are very similar"); Pro-Concepts, LLC v. Resh, No. 2:12-CV-573, 2013 WL 5741542, at *10 (E.D. Va. Oct. 22, 2013) (finding a similarity in advertising where both parties' use of the Internet made it possible for "a large number of consumers [to] encounter advertisements" for either company); Tropical Nut & Fruit Co. v. Forward Foods, LLC, No. 3:13-CV-131, 2013 WL 2481521, at *3 (W.D.N.C. June 10, 2013) (finding a similarity of advertising where a consumer could type "recharge bar" into an internet search engine and get information about both parties).

In this case, DAG (www.dynamicaviation.com) and DIA (www.fly-dynamic.com and www.airdynamic.com) operate websites with similar domain names, and both have an active presence on social media. There is also evidence that an online search for DIA could return

---

markholder would "ever bridge the gap" into the defendant's market); Worthington Foods, 732 F. Supp. at 1436–39 (analyzing relatedness of goods under "palming off" theory of infringement without reference to markholder's plans for expansion into similar markets). In contrast, DAG has shown that it intends to further expand its passenger operations into markets occupied by DIA. In fact, one of DIA's own lawyers—who presumably did not know of the current suit—contacted DAG on December 14, 2015 to express concerns that DAG's re-entry into the passenger market under the "DYNAMIC AVIATION" name could "cause significant confusion problems" for DIA. See ECF No. 46-1, at 40.

information on DAG. On the one hand, this overlap in the parties' online presence suggests the potential for confusion. On the other hand, both companies provide their services in person, not online, and there is little evidence that either party targets the same market segments with its online advertising. As such, the evidence of similar Internet advertising tilts this factor only modestly in favor of DAG.

### (iii). DIA's Intent

A defendant's intent can sometimes be a "major" factor bearing on the likelihood of confusion, "since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." Pizzeria Uno, 747 F.2d at 1535. DAG claims that DIA intentionally adopted the "DYNAMIC" mark to trade on DAG's goodwill in the aviation industry. DAG further argues that DIA exhibited bad faith in using the "Dynamic" name despite a clear contractual obligation to the contrary. For its part, DIA claims DAG has no trademark rights in the word "Dynamic" and argues it had a good-faith belief that the MIPA would not forbid use of its "DYNAMIC" or "DYNAMIC INTERNATIONAL AIRWAYS" marks.

The court agrees that DIA's failure to cease use of "Dynamic Airways" as required by the MIPA, its undisputed knowledge of DAG's protected marks, and its use of a similar "DYNAMIC" mark all suggest that DIA acted in bad faith. Even so, the rights afford by the MIPA are in dispute, and DIA can point to evidence that DAG authorized use of some "Dynamic" names. On such a mixed record, the court cannot conclude that DIA intended to induce consumer confusion when it adopted its current "DYNAMIC" mark. As such, this factor is neutral and plays no role in the court's analysis.

### (iv). Actual Confusion

DAG hangs its hat on evidence of confusion, arguing that DIA's competing use of "Dynamic" has already caused actual confusion in the aviation industry. In particular, DAG claims that sophisticated industry insiders and at least two DAG clients associated DAG with DIA's poor passenger service, which damages the reputation of the "DYNAMIC AVIATION" brand. DAG argues its evidence is sufficient to infer that other current and potential customers also mistakenly associate DAG with DIA.

Evidence of actual confusion is not required to show a likelihood of confusion, but it is entitled to "substantial weight" when present. Lone Star, 43 F.3d at 937. Actual confusion can be demonstrated by both anecdotal and survey evidence, George & Co., 575 F.3d at 398, but the key focus must be on "consumer confusion" not "confusion generally." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1214 (9th Cir. 2012); see also U.S. Conference of Catholic Bishops v. Media Research Ctr., 432 F. Supp. 2d 616, 628 (E.D. Va. 2006) ("Relevant confusion is that which affects the purchasing and selling of the goods or services in question.").

However, non-consumer confusion is relevant "if it can 'be shown that public confusion will adversely affect the plaintiff's ability to control his reputation among its laborers, lenders, investors, or other group with whom plaintiff interacts.'" Georgia Pac. Consumer Products, LP v. Von Drehle Corp., 618 F.3d 441, 453 (4th Cir. 2010) (citing Perini Corp., 915 F.2d at 128); see also Lone Star, 43 F.3d at 939 (noting that "trademark infringement primarily represents an injury to reputation."). For example, in the context of trade names, the Fourth Circuit has noted:

> A trade name symbolizes the reputation of a business. Consumers are interested in the quality and cost of the goods or services it offers; suppliers are concerned with the prompt payment of bills and credit standing; investors, with financial stability, return and growth; labor, with rates of pay, fringe benefits and personnel policies; and the general public, with management's participation in public affairs. All of these factors, and more, make up 'the communal mosaic in which

> a business enterprise must fit' and which its trade name reflects.
> Infringement of a trade name is a tort touching all these factors

Perini Corp., 915 F.2d at 128 (citing Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245,

1250 (4th Cir. 1970)). A more recent decision from the First Circuit cited Perini to hold that "the

likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes

others whose confusion threatens the trademark owner's commercial interest in its mark." See

Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 16 (1st Cir. 2004). As the Beacon court

noted, "[c]onfusion is relevant when it exists in the minds of persons in a position to influence the

purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or

reputation of the trademark owner." Id. at 10.

The reasoning in Beacon was mirrored by the Ninth Circuit in Rearden LLC v. Rearden

Commerce, Inc., 683 F.3d 1190 (9th Cir. 2012), which found non-consumer confusion relevant in

three "specific and overlapping circumstances," including where there is confusion among: "(1)

potential consumers; (2) non-consumers whose confusion could create an inference that consumers

are likely to be confused; and (3) non-consumers whose confusion could influence consumers." Id.

at 1214. In each of these three circumstances, the Ninth Circuit reasoned that "the non-consumer

confusion bears a relationship to the existence of confusion on the part of consumers themselves."

Id.[14] Similar decisions, including one from the Fourth Circuit, echo this premise, holding that the

Lanham Act protects against both direct consumer confusion and confusion among persons in a

position to influence the purchasing decisions of others. See, e.g., Georgia Pac. Consumer Products,

618 F.3d at 453–54 (citing Beacon); Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC,

793 F.3d 313, 323 (3d Cir. 2015) (same); Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc., 466

---

[14] Notably, the Ninth Circuit qualified the First Circuit's potentially broad dicta in Beacon. See Rearden, 683
F.3d at 1214 n.9. Beacon held that the likelihood of confusion inquiry could capture confusion by non-consumers,
including suppliers, potential employees, and investors, because confusion by these parties affected the markholder's
reputation. 376 F.3d at 10–11, 15–18. In contrast, the Ninth Circuit found that confusion of non-consumers was
relevant only where such confusion indicated a likelihood of confusion by actual consumers. Rearden, 683 F.3d at 1214
n.9.

44

F.3d 630, 634 (8th Cir. 2006) (same). Guided by this precedent, the court will consider evidence of both consumer and non-consumer confusion under this factor.

DAG points to multiple incidents of alleged confusion, including evidence that the AeroTransport Data Bank mistakenly associated DAG's and DIA's aircraft in multiple industry publications, ECF No. 4-1, at 43–45; ECF No. 46-1, at 7–12, that a DAG executive received an emailed news alert containing a report on DIA that was mislabeled as a report for DAG, ECF No. 4-1, at 41–42, that a creditor filed a state lawsuit against DIA in Harrisonburg, VA—DAG's principal place of business—on the mistaken belief that the two companies were related, Zook Aff., ECF No. 46-1, at ¶ 6, that other vendors in the aviation industry placed holds on DAG's accounts because of DIA's unpaid invoices, ECF No. 46-1, at 28–38, that DAG was contacted by yet another creditor seeking to recover a receivable owed by DIA, Zook Aff., ECF No. 46-1, at ¶ 7, and that DIA's own lawyers contacted DAG to express concerns that DAG's re-entry into the passenger market under the "DYNAMIC AVIATION" name could "cause significant confusion problems" for DIA, ECF No. 46-1, at 40.[15]

Further, Stoltzfus testified as to conversations he had with potential customers who expressed concerns about the potential affiliation between DAG and DIA. For example, Stoltzfus recounted how he was forced to clarify that DAG had no association with DIA during an initial conversation with potential domestic customer. Stoltzfus also noted that DAG hopes to expand into international markets, specifically Brazil, where he believes DIA's history of poor performance will affect DAG's ability to receive the necessary certifications from the Brazilian government.

Most importantly, DAG cites significant confusion arising from an accident involving a DIA airplane. ECF No. 46-1, at 13–15. On October 29, 2015, a DIA passenger aircraft caught fire while

---

[15] As noted above, the court finds it difficult to effectively cite to ECF No. 4-1 because of the many exhibits attached to that filing. The same is true for ECF No. 46-1. As such, the court uses the page numbers provided by the CM/ECF system where appropriate.

taxiing for takeoff at the Fort Lauderdale-Hollywood International Airport. Id. The plane prominently displayed DIA's "DYNAMIC" mark, which was visible in the various news reports covering the accident. Pl. Ex. 31, ECF No. 56-31. DAG points to multiple communications from industry insiders and at least one customer who believed the "DYNAMIC" plane burning in Fort Lauderdale was operated by DAG. DAG executives were contacted by the President of the National Air Transportation Association, ECF No. 46-1, at 16, from at least one media outlet, ECF No. 46-1, at 20–21, its own insurance broker (who had likewise received calls from underwriters about DAG's role in the plane accident), Zook Aff., ECF No. 46-1, at ¶ 4(e), its outside public relations agent, ECF No. 46-1, at 22, and various close friends and business acquaintances, id. at 23– 25, 27. Further, BHP Billiton, an energy company reviewing a bid for DAG's services, contacted DAG executives in the belief that DAG was associated with the "DYNAMIC" plane burning in Fort Lauderdale. Zook Aff., ECF No. 46-1, at ¶ 4(i); see also ECF No. 46-1, at 26. DAG also provided an analytic survey of the traffic to its main website, www.dynamicaviation.com from October 29. Pl. Ex. 32, ECF No. 56-32. The survey showed a significant spike in website traffic on DAG's website, especially among first-time users, on the day of the accident. Id.

In addition, DAG showed that confusion extended beyond the date of the accident. DAG representatives participated in a United Nations seminar in November 2015, which was attended by other air charter companies. ECF No. 46-1, at 39. Despite advertising themselves as DAG employees, DAG's representatives were associated with DIA and the fire in Fort Lauderdale. Id.

Based on this evidence, the court is persuaded that the confusion factor strongly favors DAG. First, there is evidence that at least two consumers believed DAG was affiliated with DIA, including one client who contacted DAG after a plane branded with DIA's "DYNAMIC" mark caught fire and received national television exposure. This evidence of actual consumer confusion suggests that current and potential clients believe DAG is connected to DIA and its record of poor

service, which threatens serious damage to the value of DAG's "DYNAMIC AVIATION" marks. Standing alone, the court finds this evidence of actual confusion among consumers significant. See Inst. for Justice, 2015 U.S. Dist. LEXIS 161264, at *26–27 (finding anecdotes of actual confusion "quite compelling" in infringement claim).

Second, there is also evidence of confusion among relevant non-consumers. The record shows that several highly-sophisticated parties within the aviation industry associate DAG with DIA's passenger operations. This includes evidence that aviation vendors, airline executives, creditors, industry reporting services, and the president of a leading industry advocacy organization connect DAG and "DYNAMIC AVIATION" with the various financial woes and other problems experienced by DIA under its "DYNAMIC" mark. While evidence of non-consumer confusion is not necessarily as compelling as direct evidence of consumer confusion, the industry insiders cited by DAG are in a position to influence the purchasing decisions of DAG's current and potential clients. Moreover, these non-consumers possess greater information about the aviation marketplace, and are expected to more easily distinguish between similar entities within the industry. If well-informed industry insiders are confused, there is a strong inference that potential consumers are also confused. See Sweetwater Brewing Co., LLC v. Great Am. Restaurants, Inc., 266 F. Supp. 2d 457, 463 (E.D. Va. 2003) (noting that the confusion of "sophisticated professionals . . . is perhaps most probative on the issue of actual confusion") (quoting Morningside Group Ltd. v. Morningside Capital Group., L.L.C., 182 F.3d 133, 142–43 (2d Cir. 1999)); 3A Callmann, Unfair Competition, Trademarks, & Monopolies, § 21.82 (4th ed.) (noting that evidence of confusion among industry insiders is strong evidence of confusion, since such persons "are expected to be more knowledgeable than ordinary consumers about the source of products in their industry").

For its part, DIA concedes that non-consumer confusion is relevant, but argues that DAG has offered only de minimis evidence of actual confusion. In particular, DIA claims that DAG's

47

evidence does not conclusively prove that non-consumers were confused, shows only "mere inquiries" into DAG's relationship with DIA, and does not show that DAG suffered lost sales or lost vendors from the alleged confusion.[16] While several of these arguments are well-reasoned, the court ultimately finds them unpersuasive.

First, DAG's lost-sales argument is quickly dismissed. Confusion is relevant not only when it leads to lost sales, but also when it inflicts damage to the markholder's "goodwill" or "reputation." Beacon, 376 F.3d at 15. "The fact that the injury is to a company's reputation or goodwill, rather than directly to its sales, does not render the confusion any less actionable." Id.; see also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1091 (7th Cir. 1988) ("[W]e have held that "the owner of a mark is damaged by a later use of a similar mark which place[s] the owner's reputation beyond its control, *though no loss in business is shown.*") (emphasis and alteration in original) (quoting James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976)). DAG can show confusion among potential consumers and non-consumers alike, both of which threaten DAG's commercial interest in its "DYNAMIC AVIATION" marks. At minimum, DAG has carried its burden to show confusion among vendors, creditors, and other insiders who mistakenly associate DAG's business with that of DIA. This confusion among industry insiders, when combined with evidence of actual confusion among at least two DAG clients, raises a strong

---

[16] DIA also urges the court to ignore any hearsay evidence proffered by DAG. However, a preliminary injunction hearing is "less formal" than other court procedures, and a court "may rely on otherwise inadmissible evidence, including hearsay evidence." See Lockhart v. Home-Grown Indus. of Georgia, Inc., No. 3:07-CV-297, 2007 WL 2688551, at *4 (W.D.N.C. Sept. 10, 2007); see also Imagine Medispa, LLC v. Transformations, Inc., 999 F. Supp. 2d 862, 869 (S.D.W. Va. 2014) (finding that courts can consider evidence "that might otherwise be inadmissible" when ruling on preliminary injunctions); Signature Flight Support v. Landow Aviation Ltd. P'ship, No. 1:08-CV-955, 2009 WL 90849, at *3 (E.D. Va. Jan. 13, 2009) (same); Am. Angus Ass'n v. Sysco Corp., 829 F. Supp. 807, 816 (W.D.N.C. 1992) ("Hearsay evidence may be considered in a preliminary injunction hearing."). While some district courts in this circuit refuse to accept hearsay evidence in the injunction context, G.G. ex rel. Grimm v. Gloucester County Sch. Bd., No. 4:15-CV-54, 2015 WL 5560190, at *10 (E.D. Va. Sept. 17, 2015), a total of seven circuit courts now allow courts to consider hearsay evidence for "the limited purpose of determining whether to award a preliminary injunction." See Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) (joining decisions from the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits). Absent contrary authority from the Fourth Circuit, this court will adopt the majority rule. Because it finds DAG's hearsay evidence both relevant and reliable, it will consider such evidence for purposes of this motion.

48

inference that there is also confusion among consumers in the marketplace. See Morningside Group, 182 F.3d at 141 (noting that infringement occurs when an infringer's actions "are likely to deceive as to the affiliation, connection, or association of the infringer with the plaintiff") (internal citation omitted).

With that said, the court agrees that some examples cited by DAG show "mere inquiries" into the connection between DAG and DIA. For instance, DAG notes that it received an email from a Reuters reporter asking about DAG's ownership of DIA's predecessor, Dynamic Airways, LLC. The email implies that the reporter appreciated the distinction between DAG and DIA and only sought clarification about the past relationship between the companies. This evidence, on its own, is not confusion. Likewise, the court discounts evidence that friends and family of DAG's executives mistook DIA's burning "DYNAMIC" plane for a DAG aircraft. While a markholder's family and friends may have unique insight into the markholder's organization, the court is not convinced that these individuals are relevant non-consumers for purposes of the confusion factor. Nevertheless, even ignoring this evidence, the court finds sufficient confusion among industry vendors, executives, and potential customers to tip the scales in favor of DAG.

Similarly, the court acknowledges that some of the confusion implicates DIA's concurrent use of the name "Dynamic Airways" and its "DYNAMIC" mark. For example, the AeroTransport Data Bank mislabeled various aircraft belonging to DAG and DIA in its industry reports. This confusion may have arisen both because DIA used the name "Dynamic Airways" in violation of the MIPA and because DIA was using a "DYNAMIC" mark confusingly similar to DAG's "DYNAMIC AVIATION" marks. However, that DIA's breach of subparagraph 7(i) may have contributed to market confusion does not detract from evidence that DAG's customers and other industry insiders associated DAG with planes branded with DIA's "DYNAMIC" mark. Nor is the court convinced that any consumer confusion can be dismissed as a result of the prior association

49

between DAG and DIA's predecessor company, Dynamic Airways, LLC. The evidence of confusion cited by DAG first began in August 2015 and extended into 2016, nearly two years after Kraus and Woolley acquired a majority position in DIA, and almost a year after the Stoltzfuses sold their remaining 20% interest in the company. In sum, DAG has presented convincing evidence of confusion among consumers and relevant non-consumers that is harming DAG's industry goodwill and reputation. Accordingly, the confusion factor weighs heavily in favor of DAG.

### (v). Quality of DIA's Services

The quality of a defendant's services is typically relevant only in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." George & Co., 575 F.3d at 399. In this case, the record is replete with evidence of significant consumer dissatisfaction, regulatory concerns, and various financial blunders involving DIA. DAG assumes this evidence is relevant, arguing that DIA's poor service is "directly contrary to DAG's core values." ECF No. 46, at 19. However, this argument conflates evidence of confusion with evidence of irreparable harm. As the Second Circuit noted:

> Essentially, there are two issues with regard to quality, but only one has relevance to determining the likelihood of confusion. If the quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, i.e., through dilution of the senior user's brand. A marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user. Conversely, where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of [harm].

Savin Corp. v. Savin Group, 391 F.3d 439, 460–61 (2d Cir. 2004). While the Fourth Circuit has not yet adopted this reasoning, this court is persuaded that Savin Corporation properly defines the scope

of this factor.[17] The Fourth Circuit's test for likelihood of confusion focuses on whether the

defendant's use of a protected mark is likely to produce confusion among consumers. The quality

of a defendant's product is relevant only to the extent that it makes it more or less likely a consumer

will mistake the origin of the relevant goods or services. In this case, nothing about concerns raised

over the quality of DIA's passenger service makes it more likely that a consumer will mistake those

services with DAG. As such, the court does not find that the quality of DIA's services supports

DAG's claim for confusion.

### (vi). Consumer Sophistication

The final factor addresses the sophistication of the relevant consumer. Because

sophisticated consumers are informed buyers, they are more likely to distinguish between slight

differences in trademarks and trade dress. Perini Corp., F.2d at 127. Consumer sophistication can

be proved in multiple ways, including expert opinions, market surveys, and inferences drawn from

the "nature of the product or its price." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 390

(2d Cir. 2005). As neither party offered any expert opinion or survey on this issue, the court

considers only the nature and cost of DAG's services.

DAG urges the court to consider the "public at large" as the relevant consumer. However,

DAG targets a select group of consumers, including private corporations, business executives, and

government contractors. With the exception of its charter service and its expansion into the

passenger carrier market, the bulk of DAG's work involves highly-specialized, high-cost services that

have no connection with the normal consumer. This fact would normally favor DIA, since DAG's

---

[17] The Fourth Circuit has also suggested that the poor quality of a defendant's goods could indicate bad faith. Sara Lee, 81 F.3d at 467 ("If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity of like nature but superior manufacture, that the defendant's product is markedly inferior is likely to be highly probative of its reliance on the similarity of the two marks to generate undeserved sales."). However, the court has already determined that DIA's intent is inconclusive and thus irrelevant, and the poor quality of DIA's services does not change that finding.

more sophisticated consumers are less likely than the general airline passenger to be confused by similar marks.

However, even sophisticated consumers can be deceived. Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245, 1252–53 (4th Cir. 1970) (noting that the "expertise of purchasers does not always assure the absence of confusion"). As the Fourth Circuit notes, the most knowledgeable buyer can be "uninitiated in the intricacies of [a] corporate family" such that they "assume that related corporations are the source of noncompetitive goods." Id. Here, DAG has offered evidence that its sophisticated customers and other industry insiders associate DIA and its various performance problems with DAG and its "DYNAMIC AVIATION" brand. Put differently, it appears that even highly-sophisticated consumers in the aviation industry believe the similar marks of DAG and DIA emanate from a single source. As such, the evidence of actual confusion presented by DAG outweighs the relative sophistication of DAG's consumers, which might otherwise have mitigated against a likelihood of confusion. Cf. Banff, Ltd. v. Federated Dept. Stores, Inc., 841 F.2d 486, 492 (2d Cir. 1988) (finding that sophisticated consumers did not mitigate the likelihood of confusion "where both parties produce lines of quality apparel under strongly similar marks").

### 3. Summary

Based on a consideration of the above-discussed factors, the court finds that DAG has carried its burden to show that DIA's use of the "DYNAMIC" mark infringes on its registered "DYNAMIC AVIATION" marks. DAG offers conclusive evidence of its ownership of the "DYNAMIC AVIATION" marks. It has also showed that DIA's use of the "DYNAMIC" mark is likely to confuse consumers about the origin of DIA's services. Of the nine confusion factors, the evidence of actual confusion, similarity of the relevant marks, and similarity of services between DAG and DIA all strongly favor a finding of confusion. The remaining factors either weigh slightly

in favor of DAG or are neutral. On balance, the court thus finds that DAG has made a clear showing that it is likely to succeed on some portion of its trademark infringement claim.

## C. Irreparable Harm

Having found a likelihood that DAG will succeed on some portion of its claims for breach of contract and infringement, the court will evaluate the remaining preliminary injunction factors as to those claims. In addition to showing it is likely to succeed on the merits, DAG must also "make a clear showing that it is likely to be irreparable harmed absent preliminary relief." Real Truth About Obama, 575 F.3d at 347. The "key word . . . is irreparable." Va. Chapter, Associated Gen. Contractors, Inc. v. Kreps, 444 F. Supp. 1167, 1182 (W.D. Va. 1978). "[G]enerally 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S 7 (2008). "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." Id. at 552 (citation omitted). Irreparable harm must be "actual and imminent" and not "remote" or "speculative." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)).

DAG argues that DIA's breach of subparagraph 7(i) of the MIPA and its use of the "DYNAMIC" mark is causing immeasurable harm to its customer goodwill and industry reputation. DAG points to evidence that DIA has developed a reputation for unreliable operations and financial problems. Because DIA's breach of the MIPA and its use of similar marks has caused consumers and industry insiders to associate DIA's sub-par performance with DAG, DAG claims it risk permanent loss of competitive strength in the aviation industry. The court agrees.

The loss of goodwill or industry reputation "is a well-recognized basis for finding irreparable harm." MicroAire Surgical Instruments, LLC v. Arthrex, Inc., 726 F. Supp. 2d 604, 635 (W.D. Va. 2010). Courts in the Fourth Circuit have held that "loss of clients' goodwill and future business . . . [is] difficult, if not impossible, to measure fully." Fidelity Global Brokerage Grp., Inc. v. Gray, No. 1:10-CV-1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (quoting IDS v. Sun Am., 958 F. Supp. 1258, 1281 (N.D. Ill. 1997)); see also Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc., 550 F.2d 189, 197 (4th Cir. 1977) (finding irreparable injury where the plaintiff offered evidence of "[w]ord of mouth grumbling of customers" that threatened plaintiffs with a "reputation for general unreliability as a merchant"), abrogated on other grounds by Real Truth About Obama, 607 F.3d at 355; W. Indus.-N., LLP v. Lessard, No. 1:12-CV-177, 2012 WL 859459, at *10 (E.D. Va. Mar. 13, 2012) (finding irreparable harm where defendant's violation of an employment agreement would cause the plaintiff to "clearly lose future business"). This rule holds true in the context of trademark infringement claims, as violation of a trademark "can result in irreparable harm where there is an inherent injury to the goodwill and reputation of the plaintiff." NaturaLawn of Am., Inc. v. W. Group, LLC, 484 F. Supp. 2d 392, 401 (D. Md. 2007); see also Rebel Debutante LLC v. Forsythe Cosmetic Group, Ltd., 799 F. Supp. 2d 558, 580 (M.D.N.C. 2011) (finding irreparable harm where competing uses of the same mark would "decrease [the plaintiff's] opportunity to develop goodwill and reputation"). To be sure, blanket claims that a plaintiff would lose goodwill or industry reputation absent an injunction does not suffice. See MicroAire, 726 F.Supp. 2d at 637 (finding that a court must analyze "the specific facts of the case" before determining that a plaintiff's claims for lost goodwill are irreparable injuries). However, where a plaintiff can demonstrate that it faces commercial harm that cannot be adequately compensated with monetary damages, that plaintiff carries his burden on this factor.

Here, the court is persuaded that the similarity between DAG's marks and that of DIA, in addition to DIA's ongoing breach of subparagraph 7(i), creates an actual threat that the consuming public will falsely associate DAG with DIA's passenger service. DAG presented evidence of problems associated with DIA's passenger services, including at least one major airline accident, and multiple reports of unsanitary aircraft, operational problems, and financial instability. DAG has no ability to correct or control DIA's operations, yet has become associated with the negative impressions created by DIA's business woes. This confusion robs DAG of control over its own reputation and the value of its brand. DIA's safety record, in particular, raises the specter that DAG will be connected with future DIA accidents. This could irrevocably affect DAG's reputation in the airline industry, where safety is of obvious importance. Calculating the monetary damages stemming from such lost goodwill and reputation would be difficult, if not impossible. As such, DAG satisfies its burden to demonstrate irreparable harm.[18]

Moreover, it is irrelevant that the injunction in this case is based on both DAG's contract and infringement claims. Loss of goodwill and industry reputation can constitute irreparable harm for either claim. See, e.g., Toolchex, Inc. v. Trainor, 634 F. Supp. 2d 586, 593 (E.D. Va. 2008) (finding that use of protected trademark and its related damage to goodwill is irreparable harm for purposes of trademark claim); MetroPCS New York, LLC v. Riverhead Water Dist., No. 15-CV-6311, 2016 WL 373969, at *2 (E.D.N.Y. Jan. 29, 2016) ("A party's 'loss of reputation, good will, and

---

[18] The court notes a growing confusion about the presumption of irreparable harm normally applied in trademark cases. Prior to 2006, many courts presumed that irreparable harm existed whenever a markholder demonstrated a likelihood of success on the merits of its infringement claim. However, the Supreme Court has since clarified the preliminary injunction standard—including the standard for irreparable harm—in its decisions in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), and Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008). Construing eBay and Winter, some courts now refuse to presume irreparable harm even when plaintiffs show they are likely to succeed on their infringement claim. See, e.g., Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205, 216 (3d Cir. 2014). Others courts, including at least one district court in the Fourth Circuit, still apply the presumption of irreparable harm. See Rebel Debutante, 799 F. Supp. 2d at 580 ("At this stage and in the absence of any indication from the Fourth Circuit to the contrary, the court will not discard the commonly-applied presumption of irreparable harm in preliminary injunction proceedings involving a trademark infringement claim."). However, the court need not resolve this conflict because the facts in this case support an independent finding that DAG faces a substantial threat of irreparable injury absent an injunction.

55

business opportunities' resulting from a breach of contract may constitute irreparable harm.") (quoting Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004)). As DAG has shown that DIA's continued use of the "Dynamic Airways" name and its concurrent use of the "DYNAMIC" mark both create an imminent risk of irreparable harm, the court finds that this factor favors an injunction on both claims.

For its part, DIA cites DAG's delay in bringing suit as evidence that DAG faces no irreparable harm. DIA claims DAG had an ongoing relationship with DIA and had multiple opportunities from 2013 to 2015 to object to DIA's use of the "Dynamic" name and marks. DIA argues that DAG never communicated its concerns about DIA's use of the word "Dynamic" until bringing this lawsuit in late 2015. However, the court is not persuaded that any delay detracts from DAG's claims for irreparable harm.

To be sure, "an application for preliminary injunction is based upon an urgent need for the protection of [a] [p]laintiff's rights [and] a long delay in seeking relief indicates that speedy action is not required." Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989) (internal citation omitted). However, the need for urgent relief must be balanced against the "goal of voluntary resolution of disputes." Rebel Debutante, 799 F. Supp. 2d at 580. In this case, the record shows that DAG and DIA corresponded about DIA's use of the "Dynamic" name approximately seven months after the MIPA was signed in October 2014. These communications were a part of an ongoing effort to resolve DAG's concerns without the need for litigation. DAG also represents that it was unaware of the full extent of DIA's infringement, but took further steps to address the issue with DIA once the full scope of the problem became clear. Ultimately, DAG filed suit in June 2015—ten months after the MIPA was signed—once it became convinced DIA was ignoring its contractual obligation to change its legal name from "Dynamic Airways" and was using the "DYNAMIC" mark on its website and airplanes. Such a delay is reasonable under the

56

circumstances, and does not detract from DAG's claim for irreparable injury. See Rebel Debutante, 799 F. Supp. 2d at 580 (holding that six-month delay in bringing infringement action did not prevent a finding of irreparable harm); see also Splitfish AG v. Bannco Corp., 727 F. Supp. 2d 461, 468 (E.D. Va. 2010) (finding irreparable harm was present where eight-month delay in case was explained by plaintiffs' effort to reach an "efficient out-of-court resolution"). Accordingly, the court finds that DAG has met its burden to show irreparable harm.

## D. Balance of Equities

Next, a court must balance the equities to assess the harms facing both parties. In this case, the court finds that the balance of equities weighs in favor of DAG. As addressed above, DAG has shown it is likely to succeed on the merits of its claims for breach of contract and trademark infringement. Further, DAG's control over its brand, its industry reputation, and customer goodwill are all threatened by its ongoing association with DIA's operations, and DAG faces an actual risk of irreparable harm as consumers and others within the aviation industry continue to connect it with DIA's problematic operational history.

For its part, DAG claims an injunction would effectively shutter its business. DIA notes that changes to its corporate name and trademarks would require extensive re-branding and administrative costs, including: (1) securing new lines of credit and other financial certifications; (2) issuing new security badges to employees; (3) updating baggage tags, boarding passes, and other operational forms; (4) updating aircraft manuals and logbooks; (5) seeking re-issuance of relevant FAA certificates and legal contracts; (6) re-painting of aircraft; and (7) publishing press releases and other marketing material to re-establish itself in the market. The need to update filings with the FAA and DOT are of particular concern, since the administrative process involved in re-issuing the relevant certificates can take multiple months. DIA also notes that federal regulations would require DIA to terminate existing contracts in international markets, forcing it to cancel thousands of

57

outstanding passenger tickets. In sum, DIA argues that an injunction would cost it over eight million dollars and force a months-long halt in operations.

At first glance, DIA's arguments are compelling—courts are reluctant to grant injunctive relief when the defendant's business could not survive the resulting costs. See Wilson-Cook Med., Inc. v. Wiltek Med., Inc., No. 90-2911, 1991 WL 27150, at *2 (4th Cir. Mar. 6, 1991) (per curiam) (affirming denial of an injunction where preliminary relief would have a "death penalty effect" on defendant); F.T.C. v. Verity Int'l, Ltd., 124 F. Supp. 2d 193, 204 (S.D.N.Y. 2000) (noting that courts should be reluctant "to impose what might be a commercial death sentence at an interlocutory stage if there is some reasonable alternative"). Yet, the court concludes that DIA's fears of irreparable harm ultimately are overstated. In calculating the harm it would incur, DIA assumed the court would order the full injunctive relief sought by DAG. This would include ordering DIA to change its corporate name, cease all use of any name containing "Dynamic," and re-start operations under a new brand.

However, the injunction this court will order is much more limited. DIA will not be enjoined from use of the name "Dynamic International Airways" or "Air Dynamic," will not be required to change its corporate name, and may continue use of its "DYNAMIC INTERNATIONAL AIRWAYS" mark. As stated above, DAG has not met its burden at this preliminary stage to show that DIA's use of these "Dynamic" names is a breach of the MIPA or otherwise infringe on DAG's "DYNAMIC AVIATION" marks. As such, DIA will only be enjoined from further use of the "DYNAMIC" and "DYNAMIC AIRWAYS" marks.

The limited scope of the injunction leads to an equally limited risk of harm to DIA. Because DIA will not be enjoined from use of "Dynamic International Airways" and may continue operations under that corporate name, it need not cancel existing contracts, seek re-issuance of its FAA certificates, or incur the other administrative costs associated with the broad injunction initially

58

requested by DAG. Therefore, DIA's fears of ticket cancellations, disruptions to passenger operations, and other commercial injuries are moot. More importantly, DIA will retain the balance of its investment in the "DYNAMIC INTERNATIONAL AIRWAYS" brand until there is final decision on the merits of DAG's amended complaint..

To be sure, DIA will incur some costs as a result of the injunction. It will be required to re-brand at least three of its airplanes that currently display the "DYNAMIC" mark, update its advertising, marketing, and social media materials, and take other steps necessary to cease use of its "DYNAMIC" and "DYNAMIC AIRWAYS" marks.[19] However, the costs associated with this more limited injunction pale in comparison to the "death sentence" DIA claimed it would face if it was enjoined from all use of the "Dynamic" name. As such, after comparing the significant reputational harm faced by DAG with the commercial injury DIA will incur, and considering the other legitimate interests at stake, the court finds that the balance of equities warrants an injunction.

### E. Public Interest

Finally, DAG must show that the public interest favors an injunction. With respect to DAG's claim based on paragraph 7(i) of the MIPA, the public is best served when courts enforce provisions of valid contracts. Superior Performers, Inc. v. Meaike, No. 1:13-CV-1149, 2014 WL 1412434, at *16 (M.D.N.C. Apr. 11, 2014) ("[T]he public interest is served by ensuring that valid contracts are enforced."); JTH Tax, Inc. v. Geraci, No. 2:14-CV-236, 2014 WL 4955373, at *8 (E.D. Va. Oct. 2, 2014) ("[T]he public interest will be served by requiring parties to value the sanctity of contract."); UBS Painwebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002) ("The public has an interest in ensuring that contracts are enforced."). Similarly, protection of trademark rights is

---

[19] As the court will specify in its accompanying Order, however, re-branding these planes does not require a full re-painting of the aircraft. DIA may choose to keep its red and white color scheme and "wing tip" logo, and simply cover the name "Dynamic." In the alternative, it may also replace the current "DYNAMIC" mark with the "DYNAMIC INTERNATIONAL AIRWAYS" mark, which effectively requires DIA to append "International Airways" to its current "Dynamic" script. Of course, DIA may also choose to implement a completely new brand.

always in the public interest. See H. Jay Spiegel & Associates, P.C. v. Spiegel, 652 F. Supp. 2d 630, 638 (E.D. Va. 2008). So too is the public interest advanced when courts prevent the consumer confusion caused by duplicative use of protected trademarks. Toolchex, Inc. v. Trainor, 634 F. Supp. 2d 586, 594, (E.D. Va. 2008). In light of this precedent, the court finds that DAG has met its burden to show that a preliminary injunction would favor the public interest.

## IV.

Pursuant to Federal Rule of Civil Procedure 65(c), a district court must fix a bond whenever it grants a preliminary injunction "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "The purpose of the bond is to provide security for any damages resulting from an improvidently granted injunction." Rauch Indus., Inc. v. Radko, No. 3:07-CV-197C, 2007 WL 3124647, at *8 (W.D.N.C. Oct. 25, 2007). "The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999). The district court has discretion in fixing the amount for the security bond. Id. However, a court must be mindful that "an understated bond could cause irreparable harm on the ground that 'the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.'" Lab. Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 466 (M.D.N.C. 2015) (quoting Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)). Therefore, district judges are "guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for the harm it suffers as a result of an improvidently issued injunction." Hoechst, 174 F.3d at 423 n.3.

In this case, the court finds a bond of $400,000 to be sufficient. In setting this amount, the court considers the costs DIA will incur by re-branding at least three airplanes and updating its advertising, marketing, and social media materials. Kraus estimated during his testimony on

60

February 11, 2016, that re-painting a single plane would cost DIA $120,000. DIA also provided an exhibit in which it calculated its marketing costs, estimating that it would need to spend $84,480 on marketing and advertising, including notifying customers of its name change, updating its social media and online platforms, reprinting various business forms, and other miscellaneous expenses. Def. Ex. CC, ECF No. 55-9, at 6. However, this estimate again assumed the court would grant the full injunctive relief requested by DAG. The court's injunction falls far short of that request. As such, the court finds it necessary to adjust DIA's estimated costs for marketing and advertising downward to $40,000. After considering the limited scope of the injunction, the court finds that $400,000 is adequate security in the event it is determined that DIA was wrongly enjoined.

## V.

Having clearly met all the requirements for a preliminary injunction on some portion of its claims for relief, DAG's motion for preliminary injunction, ECF No. 45, is **GRANTED in part** and **DENIED in part**. As set forth in the accompanying Order, DIA is **PRELIMINARILY ENJOINED** during the pendency of this case from using the name "Dynamic" or "Dynamic Airways," which includes use of the "DYNAMIC" and "DYNAMIC AIRWAYS" marks as described herein. The court does not intend to enjoin DIA's use of the name "Dynamic International Airways," "Air Dynamic," or its "DYNAMIC INTERNATIONAL AIRWAYS" mark.

It is **FURTHER ORDERED** that DAG shall post an injunction bond of $400,000 with the Clerk of Court. The preliminary injunction shall issue and take effect thirty (30) days after DAG's posting of a sufficient bond. The Clerk is directed to send copies of this Memorandum Opinion to counsel of record.

An appropriate Order will be entered this day.

Entered: *March 24, 2016*

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge